GABLES CVF, INC., APPELLANT, V. BAHR, VERMEER & HAECKER ARCHITECT, LTD., ET AL., APPELLEES.

506 N.W.2d 706

Filed October 15, 1993.   No. S-91-758.

William J. Brennan and Thomas M. White, of Fitzgerald, Schorr, Barmettler & Brennan, for appellant.

Thomas J. Guilfoyle, of Frost, Meyers, Guilfoyle & Govier, for appellee Bahr, Vermeer & Haecker Architect, Ltd.

Susan E. Norris, of Gross & Welch, P.C., for appellee The Chicago Lumber Company of Omaha.

Betty L. Egan, of Walentine, O'Toole, McQuillan & Gordon, for appellee Sol Lewis Engineering Co.

HASTINGS, C.J., BOSLAUGH, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

BOSLAUGH, J.

The appellant, Gables CVF, Inc., is a defendant and the third-party plaintiff in this action which was originally brought by The Gables Association, Inc., a Nebraska condominium association. The condominium association brought the suit on behalf of the individual owners of condominium units at an Omaha condominium development known as The Gables. The

suit sought to recover $270,251.80 for the repair of alleged defects in the construction of the condominium units. These condominium units were developed by a joint venture partnership in which the appellant and Goldman-Kasin Development Company (Goldman-Kasin) were partners. Goldman-Kasin acted as the general contractor in developing The Gables condominiums. According to the district court's July 24, 1991, journal entry, Goldman-Kasin "is insolvent and in default in this action."

In addition to Goldman-Kasin and Gables CVF, also named as defendants in the condominium association's original action were Champlain Valley Federal Savings and Loan Association (Champlain Valley) and C.V. Thrift Services, Inc. (C.V. Thrift). According to the brief filed by Gables CVF, both Champlain Valley and C.V. Thrift are parent companies of Gables CVF. The condominium association's petition also named Gables Joint Venture, CVF, Inc., as a defendant. We deduce from the record, however, that Gables Joint Venture is not a separate corporate entity, but is instead simply the joint venture partnership which Goldman-Kasin and the appellant formed in order to develop The Gables condominiums.

Following the condominium association's filing of its petition, the appellant filed its third-party petition seeking contribution and/or indemnification for any claims stemming from the condominium association's original action. The third-party petition named as defendants Bahr, Vermeer & Haecker Architect, Ltd. (BVH); The Chicago Lumber Company of Omaha (Chicago Lumber); Sol Lewis Engineering Co.; and Rite-Way Construction Co., Inc.

The record indicates that a default judgment has been entered against third-party defendant Rite-Way Construction Co. The district court granted summary judgment in favor of each of the other three third-party defendants. Gables CVF then appealed from those summary judgments. This court subsequently dismissed the appeal as to Sol Lewis Engineering Co. Thus, this appeal involves only the appellant's assertion that the district court erred in granting summary judgment in favor of BVH and Chicago Lumber. The original petitioner, i.e., the condominium association, is not involved in this

appeal.

A summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences to be drawn therefrom and that the moving party is entitled to judgment as a matter of law. *Design Data Corp. v. Maryland Cas. Co.*, 243 Neb. 945, 503 N.W.2d 552 (1993). In reviewing an order sustaining a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party opposing the motion and gives that party the benefit of all reasonable inferences that may be deduced from the evidence. *Id*. Mindful of this standard of review, we first consider the facts and issues with respect to BVH.

The joint venture partnership contracted with BVH for architectural services. The contract is detailed in the 1977 edition of the American Institute of Architects (AIA) Document B141 which is entitled "Standard Form of Agreement Between Owner and Architect." This standard form outlines a complete battery of services which an architect would provide to a property owner, who would then contract with a general contractor to build a project in accordance with the architect's specifications. However, since BVH was providing services directly to an owner who was also the general contractor, many provisions for services in the standard form were deleted, and the fees for such services were accordingly eliminated.

Under the contract, BVH provided design drawings and other documents to be used in the construction of the condominium project. According to BVH vice president Gary Goldstein, BVH provided a set of "builders plans" to Goldman-Kasin. These plans were an abbreviated set of drawings and specifications regarding the condominium project. BVH and the joint venture partnership contracted for this more abbreviated set of plans because BVH could provide such plans at less cost than a complete set of plans and because the joint venture partnership did not require a complete set of drawings and specifications in light of the fact that one of the joint venture partners, Goldman-Kasin, was serving as the

general contractor.

The contract between BVH and the partnership deleted certain standard form provisions for the architect's inspection and oversight of construction. However, the parties added a provision that BVH would be paid "$125 per trip" plus mileage for "Observation of Construction" of the condominiums. After such observations, BVH provided reports to Goldman-Kasin indicating the percentage of completion of the condominium project. On at least two occasions following observation of the construction project, BVH reported problems existing with respect to the construction of the condominiums. BVH reported such construction problems to Goldman-Kasin president Sandy Kasin; the problems included cracking in a brick retaining wall and buckling of exterior siding. Subsequently, on June 4, 1984, BVH project architect Ronald Mercer wrote a letter to Sandy Kasin of Goldman-Kasin stating: "At your request, a visual inspection was made on the above project on 1 June 1984. A copy of this report is enclosed for your review. The project was found to be substantially complete, and generally in accordance with the intent of the drawings and specifications."

Despite the language in the letter quoted above, the record indicates that there were some deviations from the architect's plans. The most notable deviations seem to be: (1) The decks or balconies of the condominium units were constructed of brick or cement rather than spaced wooden boards, resulting in drainage problems; (2) a waterproof membrane was not installed in a portion of the foundation; and (3) studs on outer walls were spaced 24, rather than 16, inches apart.

In this appeal, BVH argues that its contractual duty to observe the construction of The Gables merely obligated it to determine the degree of completion of the project, but did not require it to discover and report deviations from the architect's building plans. Contrarily, the appellant argues that the contract did require BVH to report deviations from the building plans. The apellant further argues that it was damaged in the following manner: BVH failed to properly report deviations from the architect's plans; as a result of BVH's failure, funds held in escrow were released to Goldman-Kasin;

and if BVH had properly reported the deviations from the architect's plans, Gables CVF would not have released escrowed funds and, therefore, could have used those funds to employ another contractor to properly complete The Gables condominium project.

An architect's duties are determined by the contract for the architect's employment. *Getzschman v. Miller Chemical Co.*, 232 Neb. 885, 443 N.W.2d 260 (1989). Implicit in every contract for architectural services is the duty of the architect to exercise skill and care which are commensurate with requirements of the profession. *Id.*

In arguing that it cannot be held liable for damages resulting from unreported deviations from the architect's building plans, the appellant relies, in part, upon paragraph 1.5.5 of the AIA contract. That paragraph states:

> The Architect shall not have control or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, for the acts or omissions of the Contractor, Subcontractors or any other persons performing any of the Work, or for the failure of any of them to carry out the Work in accordance with the Contract Documents.

We do not believe that this clause in the contract, by itself, absolves BVH of any potential liability in this instance. Addressing similar language, a Texas court has stated:

> We conclude that the language said to be exculpatory constitutes nothing other than an agreement that the architect is not the insurer or guarantor of the general contractor's obligation to carry out the work in accordance with the contract documents. We reach this conclusion because the [contract] impose[s] nonconstruction responsibility upon the architect; to wit: to visit, to familiarize, to determine, to inform and to endeavor to guard. In short, to provide information, not to make improvements upon the job site.

*Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933, 937 (Tex. Civ. App. 1987). Thus, the exculpatory language provides that the architect is not the insurer or guarantor of work completed by

the contractor. However, such language does not absolve the architect from liability for a breach of the architect's contractual duty, if one exists, to inform the owner of deviations from the building plans when the architect has agreed to make periodic observations. The continuing question, then, is whether or not BVH had a duty to report deviations from the architect's plans.

The contractual language quoted above, i.e., paragraph 1.5.5, is contained within § 1.5 of the AIA contract; the section is entitled "Construction Phase—Administration of the Construction Contract." Section 1.5 of the contract contains provisions for an architect's administration of a separate contract for the construction of a building. Such a separate contract for construction (a contract which was not present in this instance) would typically be between the *owner* of real estate and a general contractor who would be responsible for construction in conformance with building plans provided by the architect. In this instance, however, the AIA contract was between BVH and the joint venture partnership, and as previously noted, one of the joint venture partners, Goldman-Kasin, served as the general contractor in the construction of the condominium development. Consequently, with the exception of paragraph 1.5.5, the joint venture partnership and BVH deleted all of section 1.5 of the AIA contract.

Certain deleted paragraphs of section 1.5 of the AIA contract contain provisions for onsite observation of the construction work by the architect. Despite deleting such provisions from their contract, the joint venture partnership and BVH nevertheless added the typewritten statement that BVH would be compensated at the rate of "$125 per trip" plus mileage for "Observation of Construction."

In their contract, the joint venture partnership and BVH do not define "Observation of Construction." However, paragraph 11.2 of the contract does reference another document which, viewing the evidence in a light most favorable to the appellant, helps to define that phrase. Paragraph 11.2 states: "Terms in this Agreement shall have the same meaning as those in AIA Document 201, General Conditions of the Contract for Construction . . . ."

The index to the 1976 edition of AIA Document 201 lists paragraphs 2.2.3, 7.7.1, 7.7.4, and 9.4.2 under the heading "Observations, Architects On-Site." Paragraph 2.2.3 of AIA Document 201 states:

> The Architect will visit the site at intervals appropriate to the stage of construction to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. On the basis of his on-site observations as an architect, he . . . will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor.

The contract documents which are referred to in the above-quoted paragraph include the drawings and specifications provided by the architect.

In addition, the appellant's expert witness, Harold Robertson, provided testimony indicating that "observation of construction" in the architectural industry includes an obligation to detect and report deviations from the architect's plans and specifications. It is also noteworthy that BVH was the party responsible for drafting its contract with the joint venture partnership.

If the contents of a document are not ambiguous, the document is not subject to interpretation and will be enforced according to its terms. *Home Fed. Sav. & Loan v. McDermott & Miller*, 243 Neb. 136, 497 N.W.2d 678 (1993). Whether a document is ambiguous is a question of law, and an appellate court considering such a question is obligated to reach a conclusion independent of the trial court's decision. *Id.*

Ambiguity exists in an instrument when a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Hensman v. Parsons*, 235 Neb. 872, 458 N.W.2d 199 (1990). When a document is ambiguous, it is for the trier of fact to determine the intent of the parties from all the facts and circumstances. *Id.*

In this case, the contract, drafted by BVH, noted BVH's $125 fee for "observation of construction"; however, the contract does not define the precise nature of such duties. We find that the contract is ambiguous as to what is meant by "observation of construction." Given that ambiguity, and viewing the evidence in a light most favorable to the appellant, we must conclude that BVH was not entitled to summary judgment. That is, a factual question exists regarding the nature of the contractual obligation which BVH undertook when it agreed to observe construction of the condominium units. It is up to the trier of fact, if this action reaches that stage, to determine the scope of that obligation, and then to determine whether BVH exercised the requisite skill and care commensurate with requirements of its profession in meeting that obligation.

While BVH may be liable for damages which it may have caused by its possible failure to fulfill any contractual duty which it may have had to report deviations from the building plans, we also hold that BVH cannot be held accountable as a partner in the joint venture partnership. The record shows that in contracting for architectural services, a flat fee was initially proposed, but the parties eventually agreed upon a fee which would have been less than the flat fee if the project had been abandoned, and greater than the flat fee if the project was completed. In the course of the fee negotiations, BVH vice president Gary Goldstein wrote to Goldman-Kasin explaining the proposed dual fee structure and describing BVH as a "risk-taking 'partner.' " Based upon this correspondence, the appellant argues that BVH was a partner in the joint venture partnership. However, despite such phraseology, there is no evidence in the record to support a finding that BVH was a partner in the joint venture partnership. BVH did not become a partner simply by negotiating a greater fee if the project was developed and a lesser fee if the project was abandoned.

The assertion advanced by the appellant here is, in essence, one of partnership by estoppel. In order to prove a partnership by estoppel, there must be evidence that one party held itself out as a partner, or permitted itself to be so held out, and that the other party relied on that misrepresentation to its detriment. See *South Sioux City Star v. Edwards*, 218 Neb. 487, 357

N.W.2d 178 (1984). Even when viewed in a light most favorable to the appellant, the record fails to support such a finding.

Finally with respect to BVH, we address an argument advanced by BVH in its brief stating:

> Since Goldman-Kasin was the general partner of the joint venture and was the general contractor responsible for construction of the project all knowledge or information possessed by Goldman-Kasin was also, by law, known to the other members of the joint venture. Goldman-Kasin was aware of all deviations from the plans and specifications. . . . Since the Appellant had notice of all defects, by virtue of its agent, it cannot now complain that [it] was damaged [by BVH's] failure to provide it with appropriate notice.

Brief for appellee BVH at 43. BVH's argument is accurate to a certain extent. Neb. Rev. Stat. § 67-312 (Reissue 1990) states:

> Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

The problem with BVH's argument is that we are aware of no authority for the proposition that a general contractor is, as a matter of law, assumed to be aware of deviations from building plans, and BVH fails to cite anything in the record to show that Goldman-Kasin actually had knowledge of the deviations from the building plans. See Neb. Ct. R. of Prac. 9D(2)d (rev. 1992). A party's brief may not expand the evidentiary record. See *Home Fed. Sav. & Loan v. McDermott & Miller*, 243 Neb. 136, 497 N.W.2d 678 (1993).

It is impossible to say in the present state of the record that, as a matter of law on a motion for summary judgment, Goldman-Kasin was aware of all deviations from the building plans and was not relying upon BVH to inform it of subcontractors' deviations from the architect's plans. However,

on remand, in the absence of fraud, if it is established that Goldman-Kasin was aware of the deviations from the building plans, then that knowledge must be imputed to its partner, Gables CVF, and Gables CVF would then be unable to complain that it was damaged by the failure of BVH to provide it with appropriate notice of deviations from the building plans.

We now turn to the appellant's contention that the district court erred in granting summary judgment in favor of Chicago Lumber. Chicago Lumber supplied lap siding which was used in the construction of the condominium units, and the siding buckled after it had been installed. The instructions which allegedly accompanied the siding advise the installer to maintain "moderate contact at the joints—never force fit." Thus, the instructions called for abutting the joints rather than spacing the joints. These instructions also indicate that the siding "may be applied directly to studs or over sheathing, with studs spaced 16 [inches] on center."

As noted previously, the studs on the outer walls of the condominium units were spaced 24 inches on center rather than 16 inches on center as originally designed. Consequently, contrary to the installation instructions, the siding was applied to studs spaced 24 inches on center. The appellant's expert witness, Harold Robertson, testified that the spacing of the studs may have caused the buckling of the siding. Robertson also testified that the improper placement of insulation in the outer wall may have caused condensation, leading to the buckling of the siding.

The original plaintiff's expert witness, Michael Siedschlag, viewed the cause of the buckling somewhat differently. Siedschlag testified that the buckling resulted from the absence of spacing between the siding sections. The record also shows that BVH project architect Ronald Mercer believed that the buckling was caused, in part, by inadequate spacing of the vertical joints.

Thus, conflicting evidence is presented as to the cause of the buckling of the siding. However, when viewed in a light most favorable to the appellant, the record shows that Chicago Lumber supplied siding with accompanying installation instructions which were used in the condominium project and

that because the siding was installed with abutting joints in accordance with the installation instructions, the siding buckled. Such evidence is sufficient to establish a breach of the implied warranty of merchantability with respect to Chicago Lumber's sale of the siding. See Neb. U.C.C. § 2-314 (Reissue 1992). See, also, *Laird v. Scribner Coop*, 237 Neb. 532, 466 N.W.2d 798 (1991). Thus, the district court erred in granting summary judgment in favor of Chicago Lumber.

Chicago Lumber argues that because there was no privity between itself and the joint venture partnership, no implied warranty of merchantability was applicable in this instance. Chicago Lumber bases this argument on the fact that the purchaser of the siding was Goldman-Kasin Company rather than Goldman-Kasin Development Company (i.e., Goldman-Kasin), the partner in the joint venture. Goldman-Kasin Company did purchase the siding from Chicago Lumber, and although the record is not clear on the issue, apparently Goldman-Kasin Company then sold the siding to the joint venture partnership for use in the condominium development. However, the existence of an implied warranty of merchantability does not depend upon privity between Chicago Lumber and the joint venture partnership. See *Peterson v. North American Plant Breeders*, 218 Neb. 258, 354 N.W.2d 625 (1984) (a product placed in the chain of distribution carries an implied warranty of merchantability which protects the ultimate purchaser, and privity is not required for recovery on a claim for breach of an implied warranty of merchantability.)

Finally, we also note that Goldman-Kasin Company (but not the joint venture partner, Goldman-Kasin) executed a release and indemnity agreement releasing Chicago Lumber from any claims arising out of the use of the siding in the condominium project. However, we find no evidence in the record to show that Goldman-Kasin Company was acting on behalf of the joint venture partnership when the release was executed, nor is there evidence or any allegation that Goldman-Kasin Company was the alter ego of joint venture partner Goldman-Kasin. See *Carpenter Paper Co. v. Lakin Meat Processors*, 231 Neb. 93, 435 N.W.2d 179 (1989). Consequently, based upon the record before us, we find the release does not, by itself, absolve

Chicago Lumber from liability to the appellant.

Because genuine issues of material fact remain to be decided by the fact finder, summary judgment was not appropriate, and the cause must be remanded for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WHITE, J., not participating.