# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-09-00518-CV
---

**Black + Vernooy Architects, J. Sinclair Black, and D. Andrew Vernooy, Appellants**

**v.**

**Lou Ann Smith; Jimmy Jackson Smith, Individually and as Next Friend of Rachel and Grayson Smith; and Karen E. Gravely, Appellees**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. D-1-GN-06-002615, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING
---

### O P I N I O N

Appellees Lou Ann Smith, Jimmy Jackson Smith, individually and as next friend of Rachel and Grayson Smith, and Karen E. Gravely sued appellants Black + Vernooy Architects, J. Sinclair Black, and D. Andrew Vernooy (collectively, "BVA") for negligence in connection with injuries suffered by Lou Ann Smith and Karen Gravely when the second-floor balcony of a friend's home collapsed while they were standing on it. A jury found that the injury was proximately caused by the negligence of (1) BVA, the architects who designed the home, (2) the general contractor who built the home, and (3) the framing subcontractor who installed the balcony. The jury attributed 70% of the responsibility to the general contractor, 20% to the subcontractor, and 10% to BVA. BVA now appeals, arguing that the jury's verdict was based on legally insufficient evidence. We affirm the judgment.

## BACKGROUND

In October 2000, Robert and Kathy Maxfield hired BVA to design a vacation home for them on Inks Lake, outside of Burnet, Texas. In addition to an $84,000 fee for design services, the Maxfields paid BVA a $16,800 fee to provide "contract administration services" during the construction of the residence. The agreement to provide contract administration services stated that BVA would, among other things, "endeavor to guard the Owner against defects and deficiencies in the Work." Sinclair Black, a senior architect, and J.C. Schmeil, an intern architect, designed the Maxfields' residence and prepared the construction drawings and specifications on behalf of BVA. The general contractor, Nash Builders, Inc. ("Nash"), began construction in October 2001, and completed construction of the home in May 2003.

On July 19, 2004, Gravely and the Smith family were visiting the Maxfields at the Inks Lake residence when, at some point during the visit, Gravely and Lou Ann Smith stepped out onto the upstairs balcony. A few seconds later, the balcony separated from the exterior wall of the home and collapsed, causing the two women to fall approximately twenty feet to the ground. Lou Ann Smith was rendered a paraplegic as a result of the injuries she suffered in the fall, while Gravely suffered a broken finger, a crushed toe, and multiple bruises.

Gravely and the Smiths sued the Maxfields, Nash, and BVA for negligence in connection with the collapse of the balcony. Nash and the Maxfields settled prior to trial, and a jury trial was held on the issue of BVA's liability. Black, Schmeil, and expert witnesses for both sides testified at trial that as constructed, the balcony contained a number of defects and deviations from the construction design drawings prepared by BVA, which detrimentally affected the structural

2

integrity of the balcony and ultimately led to its collapse. First, the design drawings required that the metal pipes supporting the balcony be welded to steel plate tabs, which would then be bolted to the balcony. As constructed, however, the metal support pipes were attached to the balcony using thin metal clips. The plaintiffs' expert witness, John Allen Pierce, testified that the clips used to attach the support pipes to the balcony were a type generally used to support "light-weight items such as electric conduit or plumbing piping." Second, the design drawings required that a metal support piece, referred to as a "joist hanger," be used to reinforce the attachment of each of the balcony joists to the exterior wall of the house. In the actual construction of the balcony, however, no joist hangers were used.[1] Third, the balcony handrail was not bolted to the house as required by the design drawings. Finally, and most importantly, the drawings called for the balcony to be attached to the exterior wall of the house by bolting it to an inch-and-a-half thick rim joist and another inch and a half of wood blocking. Despite these specifications, the balcony was not attached to the house using bolts, a rim joist, and blocking, but was instead nailed to a half-inch of plywood. It is undisputed that neither Schmeil nor Black identified any of these defects and deviations from their design drawings or brought them to the attention of the owner or general contractor.

Black testified that in the course of providing contract administration services, BVA was required to make periodic visits to the site while the home was under construction to, among other things, observe the construction and determine whether it was in compliance with the

---

[1] Black testified that the use of joist hangers was also required by the 1997 Uniform Building Code, published by the International Council of Building Officials. The "purpose" provision of the code, which was entered into evidence, states that the code's purpose "is to provide minimum standards to safeguard life or limb, health, property and public welfare."

3

construction documents. During certain site visits, Schmeil took photographs of the balcony, which were entered into evidence. Black testified that he had reviewed Schmeil's photographs to determine if the balcony was built "[i]n compliance with the design intent," but that he did not notice the defects or deviations from the design drawings that he and Schmeil had prepared. Looking at these photographs during his testimony, Black testified that they depicted that the handrail was not connected to the wall as required, the metal support pipes were not attached with welded and bolted tabs as required, joist hangers had not been used as required, and the balcony was not bolted to the house in the manner required by the design drawings. Black further testified that the absence of the required rim joists and welded tabs was obvious from the photographs.

Black also testified that a photograph Schmeil had taken from the interior of the house depicted plywood where the rim joist and blocking should have been. Black acknowledged that at the stage of the framing process depicted in the photograph, the rim joist should have been in place and visible, and that the rim joist was critical to the structural integrity of the balcony. When asked whether the absence of the rim joist was open and obvious at the time BVA reviewed the photographs, Black answered, "It's obvious now. We didn't notice." Black stated that if he had noticed the defects visible in the photographs, he "absolutely" would have requested that the contractor correct them. When asked, "And I assume no one in the world knew the plans, the drawings[,] and what this balcony should look like any more than you; is that true, sir?" Black answered, "Well, J.C. Schmeil and I." Black further testified that when he designed the balcony, "safety and structural integrity were an extremely important part of it."

4

Black also testified regarding photographs he had taken after construction was completed, at least one of which had appeared on BVA's website. Looking at a photograph taken of the balcony after construction was complete, Black testified that the balcony defects depicted in Schmeil's photographs remained in place.

Pierce, the plaintiffs' expert witness and a licensed architect for 49 years, testified that a reasonable and prudent architect would have identified the balcony defects at the time Schmeil's photographs were taken, brought them to the attention of the general contractor, and required that they be corrected.[2] Pierce further testified that the defects "should have been observed" because the required elements were "clearly missing." In reviewing the photographs taken by Schmeil, Pierce stated that the defects were "open and obvious" and "not hidden at all." Like Black, Pierce testified that the presence of the rim joist was critical to the structural integrity of the balcony, and that the absence of the rim joist and blocking was obvious from the photographs. Pierce also testified that as an architect, he would "certainly be looking at the [details] that affected the structural integrity of the house." When asked, "Does the fact that . . . the structural integrity of this balcony is critical, does that have something to do with a reasonable and prudent architect's duty to examine the balcony?" Pierce answered, "Certainly," further explaining that the observation of structural defects in a balcony would be critical in endeavoring to guard an owner against defects in the work.

---

[2] Pierce, who holds an undergraduate degree in architecture from Rice University and a graduate degree in architecture from Princeton University, and has been elected to the College of Fellows in the American Institute of Architects, testified that he had experience working under the standard American Institute of Architects contract language at issue in this case and that he was familiar with the duties of an architect performing contract administration under that contract. Pierce also testified that since 1960, he has "been involved in the construction contract administration of most of the projects that [his] firms have received commissions to design."

BVA's expert witness, John Nyfeler, a licensed architect for 39 years, testified that it would be possible for an ordinarily prudent architect providing contract administration services to overlook the absence of a rim joist, although he stated that the lack of a rim joist was obvious in the photographs. Nyfeler also opined that an ordinarily prudent architect "might have overlooked" the use of clips, rather than welded tabs, to attach the metal support pipes to the balcony. Nyfeler acknowledged on cross-examination that because the safety of a balcony is a critical matter, a reasonable and prudent architect should pay special attention to a balcony's structural integrity during the contract administration process. Nyfeler also testified that in providing contract administration services, an architect is "expected to make periodic visits to the project site to observe the work of the contractor," "to endeavor to protect the owner against the deviations and defects in the work," and "to call to the owner's attention deviations that he observes in . . . the quality of the work."

For purposes of comparison, the jury was presented with photographs depicting how the welded and bolted tabs attaching the metal support pipes to the balcony would have looked if they had been used as required, as well as photographs depicting the use of joist hangers in other areas of the residence. The jury also heard evidence that BVA had identified a number of defects in other parts of the residence during the construction process, and that it had required Nash to correct them.[3]

_____

[3] For example, Schmeil testified that on one of his site visits, he observed that the "framer had framed a wall too high." Schmeil brought this to Nash's attention, and the wall was lowered to comply with the design drawings. Nash also complied with Schmeil's request that caps be placed on the ends of metal pipes used in the structure, in order to avoid problems with insects building nests in the pipes. In addition, a field report prepared by Schmeil after one of his site visits was

*The Contract*

The contractual agreement between the Maxfields and BVA consisted of a standard document used in the construction industry, American Institute of Architects (AIA) Document B151-1997, Abbreviated Standard Form of Agreement Between Owner and Architect.  With respect to the provision of contract administration services, the contract included the following language:

**2.6.5**  The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the state of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 12, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents.  However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work.  The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

**2.6.6** The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor.  However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

. . . .

---

entered into evidence.  This report includes comments such as, "Sconces at stone wall not located per electrical plan (and 2 fixtures omitted)," "Cans set too far in at kitchen bay," "81¾" from finished floor to sill at fixed glass (vs. 84" indicated on drawings)," and "Outlets/switches in masonry are set crookedly."

**2.6.10** The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect shall have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

Black testified that he considered contract administration services to include making periodic site visits to observe the progress of the work, endeavoring to protect the owner against defects and deficiencies, checking the accuracy and fairness of the general contractor's pay requests, trying to make sure the home is built in compliance with construction documents, and checking shop drawings against the design intent. Black further testified that in performing contract administration for the Maxfields, BVA averaged two visits to the construction site per month. Despite the contract language and Black's testimony that BVA was required to endeavor to guard the Maxfields against defects and deficiencies in the work as part of the contract administration process, Schmeil testified, "I believed my responsibility was to endeavor to see that construction was proceeding according to the construction drawings, but not to specifically look for defects in the construction." Schmeil also acknowledged that in his deposition testimony, he maintained that he had not been looking for structural defects in the balcony, as his responsibility with respect to the balcony was limited to making "sure that it was the correct size and under the proper door opening."[4]

---

[4] In addition, the following exchange occurred during Schmeil's testimony at trial:

Q. You told me that it would have been possible to make sure that this balcony was safe, but that you didn't feel it was your responsibility. You told me that,

BVA's agreement to perform contract administration for the Maxfields also required BVA to approve Nash's applications for payment. After approving each application, BVA submitted certificates for payment to the Maxfields, which included the following language:

> In accordance with the Contract Documents, based on on-site observations and the data comprising the above-referenced Application for Payment, the Architect certifies to the Owner that to the best of Architect's knowledge, information, and belief, the Work has progressed as indicated, the quality of the Work is in accordance with the

---

didn't you, sir?

A. I don't recall.

Q. Again, let me—you recall your deposition?

A. Yes.

. . . .

Q. And my question [during the deposition] is, "Is it possible on a job site to look at other things besides paint and color? I mean, is it possible for you to look and see that the house is being [built] in a structurally sound and safe manner? Is that possible[?]"

And what's your answer?

. . . .

A. "Yes. Is that my responsibility? No."

Q. So, yes, but you didn't feel that was your responsibility?

A. No.

9

Contract Documents, and the Contractor is entitled to payment of the Amount Certified, including overage as described in documents provided by the Contractor.[5]

Black testified that one of the reasons periodic site visits are required during the contract administration process is to facilitate the architect's certification of the contractor's pay applications.

The contract further provided that BVA was to issue the final certificate for payment "based upon a final inspection indicating the Work complies with the requirements of the Contract Documents." It is undisputed that no final inspection was conducted, although there was conflicting testimony as to the reason for this omission. Black testified that the inspection process was to be triggered when the contractor called for a date of substantial completion, and that because Nash never notified him of a date of substantial completion, BVA never conducted the required inspection. Black also testified that he stopped providing contract administration services to the Maxfields after his last visit to the construction site in January 2003, because he received a phone call from Robert Maxfield, who stated, "I think Steve Nash and I can handle it from here on out." Black interpreted

_____

[5] Black testified that on several occasions, he sent the Maxfields a different certificate for payment with the following language:

> Architect's signature below is his assurance to Owner, concerning the payment herein applied for, that (1) Architect has inspected the Work represented by this Application, (2) such Work has been completed to the extent indicated in this Application, and the quality of workmanship and materials conforms with the Contract Documents . . . .

Black testified that when he noticed that these certification forms did not track the contract language, he created a "parallel form" consistent with the contract language and submitted that form to the Maxfields as well. Black also testified that there were occasions when the only form he signed and sent to the Maxfields was the form quoted immediately above, which certified that he had "inspected the Work." On these occasions, he did not send the Maxfields a parallel form that was consistent with the contract language.

10

this to mean that he would not be expected to conduct the final inspection. When asked about this discussion, Steve Nash testified, "No, that's not true," further stating that he remembered BVA being involved through completion of the project.[6] In any event, Black testified that the absence of the required rim joist where the balcony was attached to the house would not have been observable in the final inspection because the area would have been covered by finished elements such as walls and ceilings.

The jury heard evidence that Nash was required by its contract with the Maxfields to notify BVA and obtain approval for any changes to the original design of the residence. The balcony design drawings, which were entered into evidence, included the following notation: "Installation or completion of building elements in direct conflict with intent of drawings (as expressed in architectural documents) will not be acceptable without written approval from architect." It is undisputed that no such approval was requested or provided for any of the deviations from the balcony design.

After hearing the evidence, the jury found that the plaintiffs' injuries were proximately caused by the negligence of BVA, Nash, and Rodriguez, attributing 70% of the responsibility to Nash, 20% to Rogriguez, and 10% to BVA. Based on the jury's findings related to damages and proportionate responsibility, as well as adjustments for medical expenses actually paid, the trial court rendered judgment that the Smiths recover a total of $380,749.19 from BVA, plus prejudgment interest, and that Gravely recover nothing from BVA.[7] This appeal followed.

---

[6] Robert Maxfield did not testify at trial.

[7] The trial court did not take the settlement amounts received from Nash and the Maxfields into account in calculating the amounts owed to the Smiths because BVA's proportionate share of

11

**STANDARD OF REVIEW**

When reviewing a jury finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable factfinder could, disregard contrary evidence unless a reasonable factfinder could not, and reverse the factfinder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded factfinder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain a legal sufficiency challenge if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *See id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). As the finder of fact, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

---

the damages was much smaller than the total damages award minus the total settlement amount. *Compare* Tex. Civ. Prac. & Rem. Code Ann. § 33.012(b) (West 2008) (amount of damages must be reduced by dollar amounts of all settlements) *with id.* § 33.013 (West 2008) (defendant is liable only for percentage of damages equal to that defendant's proportionate responsibility, provided responsibility does not exceed 50%). The parties agreed on the record that the appropriate calculation of damages recoverable from BVA was 10% of the jury's damages award.

12

**DISCUSSION**

In a single issue on appeal, BVA argues that there is legally insufficient evidence to support the jury's finding that it was negligent because BVA did not have a duty to Gravely and the Smiths to identify the balcony defects and bring them to the Maxfields' attention. BVA's argument can be broken down into two parts. First, it argues that it had no duty to identify the balcony defects shown in the photographs taken by Schmeil. Second, it argues that if such a duty did exist, it was owed only to the Maxfields and does not extend to foreseeable visitors to the home. We will address both issues in turn.

*Existence of a Duty*

BVA contends that its contractual obligation to "endeavor to guard" the Maxfields against defects and deficiencies in the work did not constitute a duty to identify defects in the structural integrity of the balcony unless those defects were actually observed. Nyfeler, BVA's expert witness, testified that regardless of how open, obvious, dangerous, or observable a defect is, an architect providing contract administration services who does not actually observe the defect has no duty to bring it to the owner's attention. Under the circumstances presented here, we disagree. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 403 (Tex. 2009) (holding that existence of duty is question of law for court to decide).

A defendant may be liable for negligence only to the extent that it owed the plaintiff a legal duty. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). The question of whether a legal duty exists requires the balancing of "factors such as the risk and foreseeability of injury, the social utility of the actor's conduct, the consequences of imposing the

13

burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case." *Texas Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex. 2002). A contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances. *Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C.*, 252 S.W.3d 586, 594 (Tex. App.—Fort Worth 2008, pet. denied). An architect's duty "depends on the particular agreement entered into with his employer." *Id.*

Here, the contract for design and contract administration services that BVA entered into with the Maxfields provided that BVA would:

> visit the site at intervals appropriate to the state of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 12, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) *to endeavor to guard the Owner against defects and deficiencies in the Work*, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents.

(Emphasis added.) The contract further provided:

> the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

In *Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933, 935 (Tex. App.—Dallas 1987, writ denied), a case in which a general contractor had failed to build a parking garage in accordance

14

with the plans and specifications, the court of appeals addressed the architect's liability under similar

"endeavor to guard" contract language.  The contract at issue in *Hunt* stated:

> The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents.  On the basis of his on-site observations as an architect, he will keep the Owner informed of the progress of the Work, and *will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor*.  The Architect will not be required to make exhaustive on-site inspections to check the quality and quantity of the Work.  The Architect will not be responsible for the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, and he will not be responsible for the contractor's failure to carry out the Work in accordance with the Contract Documents.

*Id.* (emphasis added).  The architect in *Hunt* made essentially the same argument made by BVA in

the present case—that due to the contract language stating that the architect is not responsible for

the contractor's failure to carry out the work in accordance with the contract documents, the

architect's agreement to "endeavor to guard" the owner against defects and deficiencies did

not expose the architect to liability for failure to identify any such defects or deficiencies.  *See id.*

at 936-37.  The court of appeals rejected that argument, stating:

> We conclude that the language said to be exculpatory constitutes nothing other than an agreement that the architect is not the insurer or guarantor of the general contractor's obligation to carry out the work in accordance with the contract documents.  We reach this conclusion because the first three sentences of [the contract provision quoted above] impose a nonconstruction responsibility upon the architect; to wit:  to visit, to familiarize, to determine, to inform and to endeavor to guard.  In short, to provide information, not to make improvements upon the job site.  Therefore, we reason that the fourth sentence of [the contract provision] . . . exist[s] to emphasize the architect's nonconstruction responsibility and to make certain that the architect "will not be responsible for the [general] contractor's failure to carry out the work in accordance with the contract documents."  In short, the provider of

15

information to the owner does not insure or guarantee the general contractor's work. *It follows, and we so hold, that the contract does not exculpate [the architect] from liability for the general contractor's failure to carry out the work in accordance with the contract documents*.

*Id.* at 937 (emphasis added). We agree with the reasoning of *Hunt* and hold that while BVA is not a guarantor or insurer of the general contractor's work, it did take on "a nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard" the Maxfields from defects and deficiencies in the work. Thus, BVA may be held liable, not for the general contractor's negligence, but for a breach of its *own* duty as a "provider of information." *Id.*; *see also Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd.*, 506 N.W.2d 706, 710-11 (Neb. 1993) (reviewing similar "endeavor to guard" provision and holding that language stating architect is not responsible for acts or omissions of contractor "does not absolve the architect from liability for a breach of the architect's contractual duty, if one exists, to inform the owner of deviations from the building plans when the architect has agreed to make periodic observations"). This is consistent with the contract provision stating, "The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not . . . be responsible for acts or omissions of the Contractor . . . ."

As the court in *Hunt* clarified, "[W]e observe the separate and independent contract obligations to [the owner] of both the general contractor and [the architect]. Each breached its obligations. [The architect] breached its obligation to observe the progress of the work and to endeavor to guard [the owner] against defects in the work." 739 S.W.2d at 939. Here, too, BVA had

16

a nonconstruction obligation to endeavor to guard the Maxfields against defects in the work, and the jury was entitled to determine whether BVA was negligent in the performance of that duty.

The fact that the defects in question did not come to BVA's attention during the contract administration process does not alter the analysis, as BVA's admitted failure to observe visible and obvious defects affecting critical safety and structural integrity aspects of the balcony, despite taking and reviewing photographs of those defects, represents more than a scintilla of evidence that BVA did not fulfill its duty to "endeavor to guard" the Maxfields against defects and deficiencies. While Nyfeler testified that a reasonable and prudent architect could have overlooked the defects in the photographs, Pierce testified that for a reasonable and prudent architect hired to do contract administration services, the defects "should have been observed" because the required elements were "clearly missing." The jury, as finder of fact, was responsible for evaluating the credibility of witnesses and the weight to be given their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

On appeal, BVA argues that it was not required to "conduct continuous, exhaustive inspections of the contractors' work to search for defects and deficiencies." We agree. However, the testimony is undisputed that the defects were visible and obvious in the photographs taken by Schmeil. Black himself testified that the defects were clearly visible in the photographs, as did the expert witnesses. Thus, no "continuous, exhaustive inspections" were necessary in this case, as BVA could have discovered the defects by simply looking at the photographs taken by the architects in the course of performing the contract administration services that they were paid $16,800 to perform. Furthermore, BVA's expert witness acknowledged that defects such as the missing rim joist were

17

critical matters of structural integrity, that such defects were open and obvious in the photographs, and that a reasonably prudent architect should pay special attention to issues involving the safety and structural integrity of the balcony. It is difficult to imagine a more pressing safety concern than whether the balcony, perched twenty feet from the ground, could withstand the weight of two people without collapsing.

While an architect providing contract administration services does not have a duty to identify every possible deviation from the design drawings, we conclude that the architect does have a duty to identify observable, open, and obvious deviations that implicate safety and structural integrity and that were clearly presented to the architect. The evidence in this case is particularly unique in that the defects can be identified on photographs actually taken by the architects in the course of providing contract administration services. In contrast, in a situation where a defect is created and then immediately obscured by walls or ceilings so that it is never observable to the architect during a site visit, no duty to identify the defect would arise. Similarly, it is possible that no duty would arise if a defect is only visible from a certain vantage point and there is no evidence that the architect ever viewed the defect from that particular vantage point. In this case, however, Schmeil himself took photographs depicting the defects and deviations from the design drawings. There is no question that the defects were not only observable to Schmeil during his site visit, but also observable to both Schmeil and Black during their subsequent review of the photographs.

We do not hold that BVA had a duty to inspect the construction site for defects, to discover hidden defects, or to ascertain all deviations from the design drawings, regardless of their

significance or safety implications.[8]  Rather, we hold only that BVA had a duty, after contractually agreeing to visit the site periodically to "endeavor to guard" against defects and deficiencies in the work, to identify significant deviations from its own design drawings when those deviations implicated critical structural integrity concerns and were plainly visible on photographs taken and reviewed by BVA in the course of performing contract administration services.

While BVA emphasizes that the construction of the residence was not complete at the time the balcony photographs were taken, Black testified that at the stage of completion depicted in the photographs, the rim joist and blocking should have been in place.  Black also acknowledged that the omission of the required rim joist would only have been visible while the residence was under construction and would not have been observable during the contractually required final inspection, which, for that matter, was never performed.  Furthermore, when questioned as to whether the contractor could have gone back after the photographs were taken and remedied some of the defects by adding joist hangers or reattaching the support pipes using welded tabs, Pierce testified that "it would be something that I would certainly want to ask about because it looks like it's a permanent installation, and it's not in conformance with the [design] documents."[9]  Given the expert testimony that the balcony had the appearance of a permanent installation, the jury was

---

[8]  BVA did, however, have a *right* to inspect the construction, pursuant to the contract provision stating that "the Architect shall have authority to require inspection or testing of the Work."

[9]  Similarly, while BVA's counsel suggested during cross-examination of Pierce that the subcontractor could have used an alternative method of installing joist hangers that would render them invisible, Pierce testified, "[I]f the joist hanger was invisible and was not apparently there, if I were the architect I would certainly inquire as to where the joist hanger is, how it's installed, what did you replace it with[.]" The jury was also presented with photographs from other areas of the home under construction that depicted the use of clearly visible joist hangers.

19

entitled to determine whether BVA's failure to identify open, obvious, and observable defects in the photographs constituted negligence in the performance of BVA's contractual duty to endeavor to guard against defects and deficiencies in the work.

*Duty to Third-Party Visitors*

The question then becomes whether the duty imposed on BVA, after having contractually agreed to "endeavor to guard" against defects and deficiencies, to notify the owner of open, obvious, and observable defects implicating critical safety and structural integrity concerns extends to third-party visitors who are ultimately injured as a result of such defects. Balancing factors such as the risk and foreseeability of injury with the consequences of imposing the burden on the actor, we hold that it does. *See Peavy*, 89 S.W.3d at 33 (holding that question of whether legal duty exists requires balancing of various factors). When an architect agrees to provide contract administration services, that architect's failure to notify the owner of observable and dangerous deviations from the architect's own design drawings, particularly in connection with an element like a balcony where construction in accordance with the design drawings is a critical safety issue, creates a foreseeable risk of injury for visitors lawfully on the premises.

In the present case, BVA architects viewed photographs depicting nails where the required bolts should have been, thin metal clips where welded tabs should have been, the absence of the joist hangers required by the design drawings and the uniform building code, and the absence of a rim joist and blocking, which Black acknowledged was critical to the structural integrity of the balcony. Given the number and nature of these defects, we consider the risk of injury to a third-party visitor from BVA's failure to identify the defects and bring them to the owner's attention to be

20

foreseeable. The owners of a residence are not typically the only individuals to ever set foot on the premises, or to walk out onto the balcony. Furthermore, there was evidence in the present case that Kathy Maxfield had indicated to BVA during the construction process that she intended to frequently host visitors at the home.[10] Photographs entered into evidence at trial also reflect that the balcony provided a view of Inks Lake, which increases the likelihood that visitors to the Maxfields' vacation home would be drawn to step out onto the balcony.[11] Under these circumstances, there was a foreseeable risk that a third-party visitor to the home would be injured as a result of BVA's failure to fulfill its "nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard." *See Hunt*, 739 S.W.2d at 937. In determining whether a legal duty exists, "foreseeability of the risk is the foremost and dominant consideration." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) (internal quotations omitted).

The foreseeability factor in this case is based, in part, on the public's reliance on design professionals to properly perform their contractual obligations as a matter of public safety. When a visitor to a residence, lawfully on the premises, walks out onto a balcony, the personal safety of that visitor depends on certain professionals having non-negligently performed their contractual duties with respect to the balcony. In a case where an architect was hired to perform contract

---

[10] The record contains an email from Kathy Maxfield to Schmeil stating that a certain type of door would "seem less bother for a family place," as well as an email from Schmeil to Kathy Maxfield recommending rounded drywall corners because "the fact that this will be a vacation home used by lots of family may have some bearing on the decision (rounded might be able to take a little more abuse)." The record also contains a memorandum from Schmeil to Nash stating, "[S]ince it is a vacation house that will get pretty heavy use from extended family, [Kathy Maxfield] decided to go with the rounded corners."

[11] Gravely in fact testified that she had asked Smith to accompany her out onto the balcony for the purpose of enjoying the view.

21

administration and to "endeavor to guard" the owner against defects and deficiencies in the work, the visitor's safety depends on the architect having fulfilled this duty using the level of care, skill, and diligence that would be exercised by a reasonably prudent architect under similar circumstances.

Furthermore, the consequences of extending this duty to third parties are not so burdensome to the architect as to outweigh the risk or likelihood of injury, as the duty applies only in very limited circumstances such as those present here, where the defects were open, obvious, observable to the architect, implicated critical safety and structural integrity concerns, involved significant deviations from the architect's own design drawings despite the fact that preapproval of any such deviation was required, and were overlooked by an architect who contracted to provide contract administration services and to "endeavor to guard" the owner against defects and deficiencies in the work.[12]

BVA argues that its contractual duty to the Maxfields cannot form a basis for the negligence action in this case because Gravely and the Smiths were not third-party beneficiaries to the contract. Privity of contract, however, is not required. *See Hideca Petroleum Corp. v. Tampimex Oil Int'l, Ltd.*, 740 S.W.2d 838, 846 (Tex. App.—Houston [1st Dist.] 1987, no writ) ("[T]he trend is to dispense altogether with privity requirements in negligence suits."); *Shatterproof Glass Corp. v. James*, 466 S.W.2d 873, 879 (Tex. Civ. App.—Fort Worth 1971, writ ref'd n.r.e.) ("[A]rchitects have been held liable to parties not in contractual privity with them, despite earlier fears that such

---

[12] We note also that liability incurred by an architect in the course of providing professional services is necessarily limited by the statute of repose. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.008 (West 2002) (suit against registered or licensed architect "who designs, plans, or inspects the construction of an improvement to real property or equipment attached to real property" may not be filed "later than 10 years after the substantial completion of the improvement or the beginning of operation of the equipment in an action arising out of a defective or unsafe condition of the real property, the improvement, or the equipment").

a broadened scope of liability would eliminate those professions." (quoting Hallett & Collins, Comment, *Auditors' Responsibility for Misrepresentation: Inadequate Protection for Users of Financial Statements*, 44 Wash. L. Rev. 139, 191 (1968))); *see also Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 517 A.2d 336, 343-44 (Md. 1986) (holding that duty of architect to use due care in fulfilling its contractual duties "extended to those persons foreseeably subjected to the risk of personal injury," given that "privity is not an absolute prerequisite to the existence of a tort duty"); *Evans v. Howard R. Green Co.*, 231 N.W.2d 907, 913 (Iowa 1975) ("The liability of the architect . . . is not limited to the owner who employed him; the modern view is that privity of contract is not a prerequisite.") (citation omitted). We therefore hold that BVA's duty to use due care in fulfilling its contractual duties to the Maxfields "extended to those persons foreseeably subjected to the risk of personal injury" by its failure to do so. *Whiting-Turner*, 517 A.2d at 343-44. The fact that Gravely and the Smiths were not third-party beneficiaries to the contract does not preclude them from bringing a claim for personal injuries resulting from BVA's negligent performance of the duties imposed by that contract. *See Dukes*, 252 S.W.3d at 594 (holding that contract for professional services gives rise to duty to exercise degree of care, skill, and competence that reasonably competent members of profession would exercise under similar circumstances).[13]

---

[13] While the contract between BVA and the Maxfields included a provision stating that nothing contained in the agreement would create a cause of action in favor of a third party, we agree with the reasoning of the Iowa Supreme Court, holding in *McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362, 370 (Iowa 1972), that an architect cannot "by contract with a third party, lay down his own rules as to when he will be liable to those whom his negligence injures." The contract provision in question would, however, preclude a third party from bringing a breach-of-contract claim or other claim for economic loss against BVA based on its contract with the Maxfields.

To be clear, BVA did not have a duty to ensure that the construction site was a safe place to work, verify that Nash was following federal safety regulations, or fulfill any other obligation dependent on the right to control the means or methods of construction. *See Romero v. Parkhill, Smith & Cooper, Inc.*, 881 S.W.2d 522, 526-27 (Tex. App.—El Paso 1994, writ denied) (holding that engineer did not owe duty to subcontractor's employee injured on job site where engineer did not control means and methods of construction); *see also Graham v. Freese & Nichols, Inc.*, 927 S.W.2d 294, 296 (Tex. App.—Eastland 1996, writ denied). BVA's liability in this case is not based on any duty that would require control of the means or methods of construction, but on BVA's "nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard" against defects and deficiencies in the work. *Hunt*, 739 S.W.2d at 937.

We also reiterate that an architect providing contract administration services does not act as a guarantor or insurer of the work of the general contractor. Our holding today is limited to the facts of this case, in which the architects agreed to provide contract administration services, took and reviewed photographs of multiple open and obvious defects that negatively affected the structural integrity of a balcony that they designed, the safety of which was critical, and failed to observe those defects. Under the circumstances presented here, the jury was entitled to determine whether BVA was negligent. The potential for negligence was based on the BVA's duty as a provider of information, rather than as a guarantor of the contractor's performance. The extent of the BVA's liability, particularly given the potential negligence of other entities such as the general contractor and subcontractor, was an issue for the jury to determine. Here, the jury resolved that issue by attributing only 10% of the responsibility to BVA. We hold that this finding was supported by legally sufficient evidence. BVA's issue on appeal is overruled.

24

**CONCLUSION**

Having determined that the jury's finding of negligence is supported by legally sufficient evidence, we affirm the final judgment.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson;
    Dissenting Opinion by Justice Puryear

Affirmed

Filed:  December 8, 2010