**W.H. HUNT and A.P. Stephens d/b/a Hunt Stephens Investments, a Partnership, Appellants,**

v.

**ELLISOR & TANNER, INC., Appellee.**

No. 05–86–01029–CV.

Court of Appeals of Texas, Dallas.

Oct. 15, 1987.

Rehearing Denied Nov. 18, 1987.

Joe B. Harrison, Daniel J. Davis, Robert R. Cole, Jr., Dallas, for appellants.

William R. Allensworth, Dallas, for appellee.

Before WHITHAM, THOMAS and McCRAW, JJ.

WHITHAM, Justice.

The issues in the present case center on the architect's obligation under his contract

with the owner to observe the progress of the work and to endeavor to guard the owner against defects in the work. The owner-appellants, W.H. Hunt and A.P. Stephens, doing business as Hunt–Stephens Investments, a partnership, appeal from a judgment on the jury's verdict in favor of the architect-appellee, Ellisor & Tanner, Inc. We conclude that the contract does not exculpate Ellisor & Tanner from liability. We conclude further that the trial court erred in asking the jury to compare the architect's breach of its contract with the owner against the general contractor's breach of its contract with the owner to build in accordance with the contract documents. We find no merit in Hunt–Stephens' challenge to the adequacy of the $41,500.00 jury damage award. Accordingly, we reverse and render judgment in favor of Hunt–Stephens for $41,500.00.

The controversy arises from the construction of a shopping center and office complex. Hunt–Stephens sued Ellisor & Tanner, in its capacity as structural engineer, the general contractor, various subcontractors and material suppliers, and the architects. By agreement Hunt–Stephens substituted Ellisor & Tanner for the original architects in performing certain duties of the architects. Thus, for the purposes of this opinion Ellisor & Tanner becomes the contractual *architect* on the project. We emphasize that Ellisor & Tanner's work as structural engineer is not at issue in this appeal. The general contractor joined additional subcontractors as third-party defendants. Before trial, Hunt–Stephens settled with all parties other than Ellisor & Tanner. Once the settlement occurred, the sole issues to be tried concerned whether Ellisor & Tanner negligently designed the parking deck and whether Ellisor & Tanner breached its contractual obligations contained in the below-quoted contractual provision. The jury found that the parking deck was not negligently designed, but that Ellisor & Tanner breached its contractual obligations in its substituted role as the architect. The parties agree that the negligence issue is now moot. The jury found

that the defects in construction diminished the value of the project by the sum of $41,500.00 and that the general contractor caused ninety-five (95%) percent of these damages and that Ellisor & Tanner (as architects) caused five (5%) of these damages. Both parties filed motions for judgment notwithstanding the verdict. The trial court declined to grant either motion and rendered judgment against Ellisor & Tanner for $2,075.00, five (5%) percent of the damage award.

The general conditions contain paragraph 2.2.4 which is at the heart of the appeal. The first three sentences of the paragraph provide the contractual duties imposed on the architect upon which Hunt–Stephens relies. The reader, however, must note the fourth sentence of the paragraph. The fourth sentence includes the exculpatory language that Ellisor & Tanner insists relieves it of liability as argued under its counter-point. The critical paragraph reads:

> The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an architect, he will keep the Owner informed of the progress of the Work, and will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor. The Architect will not be required to make exhaustive on-site inspections to check the quality and quantity of the Work. *The Architect* will not be responsible for the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, and he *will not be responsible for the contractor's failure to carry out the Work in accordance with the Contract Documents.*

(emphasis added).

At trial, Hunt–Stephens did not seek to impose liability upon Ellisor & Tanner for

the general contractor's breach of its contract with Hunt–Stephens. Instead, Hunt–Stephens alleged that Ellisor & Tanner breached its written contract which obligated it to make periodic visits to the site, to determine in general if the quality of workmanship was sufficient under the contract documents, to keep the owner informed, and to endeavor to guard the owner against defects in the work of the general contractor. In this connection, the jury found that Ellisor & Tanner "breached its duties to observe the progress of the work and to endeavor to guard [Hunt–Stephens] against defects in the work of the [general contractor]." The trial court, however, over Hunt–Stephens' objection, asked the jury to compare Ellisor & Tanner's breach of contract to observe and endeavor to guard against defects against the general contractor's breach of contract to build in accordance with the contract documents. As mentioned, the jury found that the general contractor's acts or omissions caused ninety-five (95%) percent of Hunt–Stephens' injuries and that Ellisor & Tanner's acts or omissions caused five (5%) percent of Hunt–Stephens' injuries.

The jury's comparison produced a damage award as follows. Hunt–Stephens sought to recover the diminution in value of the shopping center and office complex. Hunt–Stephens argues that it proved a diminution in value after all remedial work by the general contractor had been completed of between $2,500,000.00 and $3,000,000.00. The remedial work occurred pursuant to the settlement agreement between Hunt–Stephens and the general contractor. Nevertheless, the jury found a diminution in value of $41,500.00. Applying the jury's five (5%) percent fault assessment against Ellisor & Tanner, the trial court rendered judgment in favor of Hunt–Stephens in the amount of $2,075.00.

At this point, we outline the Hunt–Stephens settlement agreement with parties other than Ellisor & Tanner. In that settlement, Hunt–Stephens settled with parties other than Ellisor & Tanner for $1,200,000.00 and for the general contractor's promise to remedy the structural defects in controversy. In addition, Hunt–Stephens assumed the defense of Ellisor & Tanner's cross-actions and agreed to reduce its recovery against Ellisor & Tanner by any amount to which Ellisor & Tanner was found to be entitled against them. In return, those parties promised to keep their personnel available to Hunt–Stephens and agreed not to allow their expert witnesses to testify for Ellisor & Tanner.

*Ellisor & Tanner's Exculpatory Defense*

In its sole cross-point, Ellisor & Tanner denies responsibility for the general contractor's failure to carry out the work in accordance with the contract documents. Ellisor & Tanner makes two points in support of its denial. First, Ellisor & Tanner notes that the jury found that the general contractor "produced work not of good quality, not free from faults and defects, and not in conformance with the contract documents." Second, Ellisor & Tanner remarks on the fourth sentence in the above-quoted critical paragraph contained in the general conditions. For convenience, we repeat that language:

> *The Architect* will not be responsible for the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, and he *will not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents.*

(emphasis added). This language is paraphrased and reemphasized in another paragraph found in the general conditions:

> The Architect will not be responsible for the acts or omissions of the Contractor, any Subcontractors, or any of their agents or employees, or any other persons performing any of the Work.

To establish its exculpatory defense, Ellisor & Tanner relies on *Moundsview Independent School District No. 621 v. Buetow & Associates*, 253 N.W.2d 836, 839 (Minn. 1977). Hunt–Stephens concedes that

*Moundsview* involves an identical contract provision. In *Moundsview*, the court held that the architect was exculpated from any liability occasioned by the acts and omissions of a contractor where the failure of a contractor to follow the plans and specifications caused a roof mishap. The court in *Moundsview* further held that "[b]y virtue of the aforementioned contractual provisions, [the architect] is absolved from any liability, as a matter of law, for a contractor's failure [to follow the contract documents]." *Moundsview*, 253 N.W.2d at 839.

█ We decline to follow *Moundsview*. We conclude that the language said to be exculpatory constitutes nothing other than an agreement that the architect is not the insurer or guarantor of the general contractor's obligation to carry out the work in accordance with the contract documents. We reach this conclusion because the first three sentences of paragraph 2.2.4 of the general conditions impose a nonconstruction responsibility upon the architect; to wit: to visit, to familiarize, to determine, to inform and to endeavor to guard. In short, to provide information, not to make improvements upon the job site. Therefore, we reason that the fourth sentence of paragraph 2.2.4 and the paragraph paraphrasing it exist to emphasize the architect's nonconstruction responsibility and to make certain that the architect "will not be responsible for the [general] contractor's failure to carry out the work in accordance with the contract documents." In short, the provider of information to the owner does not insure or guarantee the general contractor's work. It follows, and we so hold, that the contract does not exculpate Ellisor & Tanner from liability for the general contractor's failure to carry out the work in accordance with the contract documents. We overrule Ellisor & Tanner's sole cross-point.

### The Jury Comparison of the Architect's Breach of Contract with the General Contractor's Breach of Contract

Since the contract does not exculpate Ellisor & Tanner from liability to Hunt-Stephens, we reach Hunt-Stephens' challenge to the trial court's comparative fault submission, asking the jury to compare Ellisor & Tanner's breach of contract to observe and to endeavor to guard as against the general contractor's breach of contract to build in accordance with the contract documents. In its third point of error Hunt-Stephens contends that no evidence supported the submission of comparative causation to the jury and that such submission caused the rendition of an improper verdict and judgment. A reminder of the pertinent jury findings follows.

In answer to special issue number one the jury found that Ellisor & Tanner breached its duties to observe the progress of the work and to endeavor to guard Hunt-Stephens against defects in the work. In answer to special issue number two the jury found that Ellisor & Tanner's breach was a producing cause of Hunt-Stephens' damages. Over Hunt-Stephens' objection to the submission, in answer to special issue number three the jury found that the general contractor's work was not of good quality, was not free from faults and defects, and was not in conformance with the contract documents. Over Hunt-Stephens' objection to the submission, the jury found in answer to special issue number four that the general contractor's failure to produce quality work was the producing cause of Hunt-Stephens' damages, if any. Over Hunt-Stephens' objection to the submission, in answer to special issue number seven the jury found that the general contractor's acts and omissions caused ninety-five (95%) percent of Hunt-Stephens' injuries and that Ellisor & Tanner's acts or omissions caused five (5%) percent of Hunt-Stephens' injuries. Hunt-Stephens complains of the submission of special issue number seven as establishment of the doctrine of "comparative contract fault." We note that neither party cites any Texas case which permits the jury to compare the general contractor's breach of contract against the architect's breach of contract and thereby determine what percentage of the injury is attributable to each breach.

Again, we observe the separate and independent contract obligations to Hunt–Stephens of both the general contractor and Ellisor & Tanner. Each breached its obligation. Ellisor & Tanner breached its obligation to observe the progress of the work and to endeavor to guard Hunt–Stephens against defects in the work. The general contractor breached its obligation to do quality work in conformance with the contract documents free from faults and defects. As we noted above, Ellisor & Tanner's obligation was non-construction; the general contractor's obligation was construction. Thus, we reach the question of whether the trial court correctly allowed the jury to compare two such vastly different obligations in order to determine contribution to Hunt–Stephens' injuries.

■ Ellisor & Tanner maintains that (1) the principles enunciated in *Duncan v. Cessna,* 665 S.W.2d 414 (Tex.1984), and (2) the contract between the parties dictate the comparison and resulting reduction in the damage award. Consequently, we first consider the applicability of *Duncan.* We conclude that *Duncan* is inapplicable to the present case. We reach this conclusion because *Duncan* involved negligence mixed with strict liability. The present case, however, presents an action for breach of contract in which Hunt–Stephens sues for damages because it did not obtain the services that Ellisor & Tanner promised to deliver. In this connection, we note that a source relied upon by the Supreme Court in formulating its opinion in *Duncan* negates *Duncan*'s application to the present case. The Supreme Court cited the Uniform Comparative Fault Act § 1, 12 U.L.A. 38 (Supp.1986). *Duncan,* 665 S.W.2d at 428, 430. The Act, however, excludes breach of contract cases from the doctrine of comparative causation. Uniform Comparative Fault Act at § 1(b). The comments below that section provide as follows:

An action for breach of warranty is held to sound sometimes in tort and sometimes in contract. There is no intent to include in the coverage of the Act actions that are fully contractual in their gravamen and in which the plaintiff is suing solely because he did not recover what he contracted to receive.

12 U.L.A. at 40. We conclude, therefore, that when the situation is pure contract, the special issues should not include comparative causation. *See* 5 A. Corbin, *Corbin on Contracts* §§ 999–1,000 (1964). Professor Corbin states in footnote 21 of section 999:

In the contract field, however, if the acts of others (whether wrongful or not) are contributing factors, those others are not thereby joined with the defendant as having committed the breach of the contract.

At most, Ellisor & Tanner argues that the general contractor "contributed" to Hunt–Stephens' damages, but was not the "sole" cause. Professor Corbin would hold such a defendant responsible for the *total* harm suffered even though there were contributing factors to the defendant's conduct. 5 *Corbin on Contracts* at § 999. Thus, we conclude that Hunt–Stephens is not required to show the proportionate fault of each wrongdoer, but must show that Ellisor & Tanner's breach was a substantial factor. Hunt–Stephens obtained such a finding from the jury in the present case when, in answer to special issue number two, the jury found that Ellisor & Tanner's breach was a producing cause of Hunt–Stephens' damages. Hence, we decline to extend *Duncan* to the present case.

■ Next, we consider Ellisor & Tanner's argument that the contract between the parties requires the comparison and resulting reduction in the damage award. Ellisor & Tanner relies upon two writings. From the supplementary general conditions, Ellisor & Tanner points to paragraph 4.18.1 for the proposition that the general contractor agreed to hold harmless and indemnify Ellisor & Tanner from any and all damages, including the jury's award of $41,500.00. The paragraph reads:

[General] Contractor shall agree and covenant to protect, defend, hold harmless

and indemnify [Hunt–Stephens], and his agents and employees and [Ellisor & Tanner], from and against any and all claims, actions, liabilities, losses and expenses relating to any and all losses or damages, (including, without limiting the foregoing, injury to or death of persons and damage to property) allegedly or actually suffered by any person or persons in allegedly or actually arising out of or incidental to the work, services, inactivities of [General] Contractor or any of its Subcontractors under this Contract, including without limiting the foregoing, all acts and omissions of the Officers, employees, and agents of [General] Contractor and its Subcontractors in connection with any installation, job or work under this Contract or while proceeding to or from the site of any such installation, job or work, whether or not lawful or within the scope of their employment.

From the Hunt–Stephens settlement agreement with the general contractors, Ellisor & Tanner refers to the language in which Hunt–Stephens agreed:

[T]o assume the defense of each of such settling Defendants in the course of [Hunt–Stephens'] continued prosecution of its claims and causes of action against [Ellisor & Tanner] ... in the trial and/or appeal of such case(s). [Hunt–Stephens] further agrees, for the consideration expressed herein, that in the event and to the extent that at the conclusion of the trial of such case(s), [Ellisor & Tanner] ... [is] found to be entitled to any contribution or indemnity from or against any one or more of the Settling Defendants, [Hunt–Stephens] shall reduce the amount of its recovery as against [Ellisor & Tanner] ... to eliminate and release that part of any award of damages as to which any such right of contribution or indemnity, if any, is found to exist, so that the final effect is that no claim for contribution or indemnity shall continue to exist in favor of [Ellisor & Tanner]....

Ellisor & Tanner argues that these two provisions from separate contracts entitle Ellisor & Tanner to contractual indemnity from the general contractor and that the case was tried on that basis. Thus, Ellisor & Tanner asserts that the jury verdict was a jury verdict in favor of Ellisor & Tanner and against the general contractor. Hence, Ellisor & Tanner insists that the jury's verdict is the precise situation contemplated in Hunt–Stephens' settlement agreement with the general contractor. Therefore, Ellisor & Tanner maintains that the jury's verdict accomplished the result intended by the settlement agreement, which was to reduce Hunt–Stephens' recovery against Ellisor & Tanner by the percentage of causation allocated to the general contractor. We disagree. Again we observe the separate and independent contract obligations to Hunt–Stephens of both the general contractor and Ellisor & Tanner. Each breached its obligations. Ellisor & Tanner breached its obligation to observe the progress of the work and to endeavor to guard Hunt–Stephens against defects in the work. The general contractor breached its obligation to do quality work in conformance with the contract documents free from faults and defects. Again, we note that Ellisor & Tanner's obligation was nonconstruction; the general contractor's obligation was construction. In this connection, we emphasize that paragraph 4.18.1 of the supplementary general conditions applies to damages arising from the general contractor's construction work, not to damages arising from Ellisor & Tanner's nonconstruction work. Consequently, we conclude that paragraph 4.18.1 fails to indemnify Ellisor & Tanner for the damages Hunt–Stephens claims to arise from Ellisor & Tanner's breach of its obligation to observe the progress of the work and to endeavor to guard Hunt–Stephens against defects in the work. Indeed, to interpret paragraph 4.18.1 and the settlement agreement as Ellisor & Tanner would have us do produces an illogical result. Ellisor & Tanner's interpretation allows Ellisor & Tanner to collect over $100,000.00 in fees for purporting to observe the progress of the work and for purporting to endeavor to

guard Hunt–Stephens against defects in the work and yet receive indemnity from the general contractor for Ellisor & Tanner's failure to observe the progress of the work and to endeavor to guard Hunt–Stephens against defects in the work. We decline to make such an interpretation and thus absolve Ellisor & Tanner from the consequences of its breach of its non-construction obligations owed Hunt–Stephens. Therefore, we decline to hold that the contract between the parties requires the comparison and resulting reduction in the damage award.

For the above reasons, we conclude that neither the principles enunciated in *Duncan* nor the contract between the parties dictate the comparison and resulting reduction in the damage award. We conclude further, therefore, that there was no evidence to support the submission of comparative causation to the jury and that such submission caused the rendition of an improper verdict and judgment. Consequently, the trial court erred in submitting comparative causation to the jury. We sustain Hunt–Stephens' third point of error. Although we sustain Hunt–Stephens' third point of error, we must address an issue raised by Ellisor & Tanner in its response to Hunt–Stephens' third point of error. We turn now to that issue.

■ Anticipating that *Duncan* does not apply to permit the comparison and resulting reduction in the damage award, Ellisor & Tanner asserts that it should receive a credit against Hunt–Stephens' judgment. Ellisor & Tanner reasons that Hunt–Stephens obtained a double recovery. In one instance, Hunt–Stephens recovered a $2,075.00 judgment. In the second, Hunt–Stephens received $1,200,000.00 in cash under the prior settlement and the repair of the defects in the construction. Thus, Ellisor & Tanner insists that the credit it should receive erases the $2,075.00 judgment against it. We disagree. The trial court's judgment for $2,075.00 or the $41,500.00 judgment we render rests upon this issue:

What sum of money, if any, if paid now in cash will fully compensate [Hunt–Stephens] for any permanent diminution in market value of [the shopping center and office complex] which was *caused by the acts or omissions of the defendant(s)*, despite the completion of all reasonable repair procedures?

(emphasis added). We treat the reference to "defendant(s)" as meaning Ellisor & Tanner since at trial it was the only defendant. Therefore, the jury compensated Hunt–Stephens only for the separate wrong done Hunt–Stephens by Ellisor & Tanner by the latter's breach of "its duties to observe the progress of the work and to endeavor to guard [Hunt–Stephens] against defects in the work of the [general contractor]." On the other hand, the consideration Hunt–Stephens received under the prior settlement compensated Hunt–Stephens for acts and omissions of others, including the general contractor. Ellisor & Tanner was not a party to the settlement agreement. Therefore, the present case presents the situation where each wrongdoer pays separately for its own acts or omissions. Hence, we conclude that no double recovery occurs in the present case within the context of *Duncan*, 665 S.W.2d at 430–32, or *Bradshaw v. Baylor University*, 126 Tex. 99, 84 S.W.2d 703 (1935), or otherwise. We conclude, therefore, that Ellisor & Tanner is not entitled to receive a credit against a Hunt–Stephens judgment. Finding no merit in Ellisor & Tanner's double recovery issue, we adhere to our holding sustaining Hunt–Stephens' third point of error.

### Hunt–Stephens' Challenge to the Evidence

The remaining issue arises from Hunt–Stephens' challenge to the adequacy of the $41,500.00 jury damage award. Hunt–Stephens advances two points of error directed at the adequacy of the jury damage award. In its first point of error, Hunt–Stephens contends that the jury's damage award of $41,500.00 was grossly inadequate and

against the great weight and preponderance of the evidence. In its second point of error, Hunt–Stephens asserts that the jury's damage award of $41,500.00 was grossly inadequate and the product of passion, prejudice or bias. At oral argument, Hunt–Stephens conceded that its second point of error as presented was but a variation of its contention that the jury's damage award of $41,500.00 was against the great weight and preponderance of the evidence. Therefore, we dispose of both of Hunt–Stephens' points of error together as asserting that the jury's finding to special issue number eight is contrary to the great weight and preponderance of the evidence. In this connection, we note that on appeal Ellisor & Tanner does not challenge diminution in market value as the correct measure of damages. Indeed, Ellisor & Tanner tells us in a post-submission letter brief that

> [t]his is not a measure of damages case. [Ellisor & Tanner] did not appeal the measure of damages submitted by the District Court, and the resolution of this appeal does not turn on whether or not "diminution in value" is the proper measure of damages; instead, the question is whether the jury was free to be the sole judges of the credibility of [Hunt–Stephens'] expert witnesses on damages, and the weight to be given to their testimony.

Consequently, for the purposes of this opinion, we treat diminution in market value as the proper measure of damages.

Special issue number eight and the jury's answer follow:

> What sum of money, if any, if paid now in cash will fully compensate [Hunt–Stephens] for any permanent diminution in market value of [the shopping center and office complex] which was caused by the acts or omissions of [Ellisor & Tanner], despite the completion of all reasonable repair procedures? Answer in dollars and cents, if any.
>
> ANSWER: $41,500

The question before us requires this court to consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether the record contains some "evidence of probative force" in support of the verdict. *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951). Two witnesses testified for Hunt–Stephens regarding damages. Herbert Hunt, one of the owners, expressed the opinion that the overall fair market value was between $36,000,000.00 and $40,000,000.00 prior to reduction for various market factors and construction defects. After reducing this fair market value by general economic conditions, notoriety of the suit and other factors, Hunt gave the opinion that the total diminution in value was $3,000,000.00. Robert L. Halford, an architect, testified that the present and future effect of missing and misplaced steel in support columns diminished the value by ten (10%) percent. Halford applied his ten (10%) percent diminution figure to the value established by Hunt and arrived at an overall opinion that the shopping center and office complex had been diminished in value by $2,500,000.00. Thus, Hunt–Stephens insists that the parameter of permissible damages was fixed between $2,500,000.00 and $3,000,000.00 and that no evidence exists from which the jury could have found damages of $41,500.00. In this connection, Hunt–Stephens acknowledges that the jury could reject all of the damage testimony of Hunt and Halford and that it could not complain if the jury had found zero diminution in value. Hunt–Stephens argues, however, that the jury could not create its own evidence of the amount of $41,500.00 and find that there was a diminution of value in that amount.

■ On the other hand, Ellisor & Tanner finds evidence in support of the jury's finding resulting from its cross-examination of Halford. This cross-examination took into account the repairs of defects which the general contractor undertook pursuant to its settlement agreement with Hunt–Ste-

phens. Halford testified that some of the repairs which the general contractor was performing actually would enhance the value of the shopping center and office complex because the repairs improved upon the architectural finishes originally planned for the building. Hence, Ellisor & Tanner maintains that an enhanced value resulting from the repairs equals a zero diminution in value. Thus, Ellisor & Tanner contends that the jury was free to assess damages within the range of $0.00 to $3,000,000.00. As a general rule, it is peculiarly within the province of the jury to weigh opinion evidence and the judgment of experts. *Octane Oil Refining Co. v. Blankenship–Antilley Implement Co.*, 117 S.W.2d 885, 886 (Tex.Civ.App.—Eastland 1938, no writ). It is within the province of the jury to decide which expert witness should be credited. *American Airlines, Inc. v. United States*, 418 F.2d 180, 194 (5th Cir.1969). Indeed, from the range of damages to which a party's expert witness testified, the jury may determine the amount of damages. *See Wright Titus, Inc. v. Swafford*, 133 S.W.2d 287, 295 (Tex.Civ.App.—Austin 1939, writ dism'd judgmt cor.) (jury authorized to find value of converted silverware to be $75.00 against attack that it had no support in the evidence when owner testified that silverware had no value but that his investigation showed that it would cost more than $100.00 to replace the silverware). In the present case, Hunt's and Halford's testimony afforded a range of zero to $3,000,000.00 in a case in which the complex nature of the witness' testimony, both direct and cross-examination, afforded the jury much opportunity to accept and reject what they were hearing. "[Expert opinion] testimony is but evidentiary, and is never binding upon the trier of facts. Thus, the factfinder is not cut off from exercising considerable personal judgment about how far such opinions are to be relied upon." *Main Bank & Trust v. York*, 498 S.W.2d 953, 957 (Tex.Civ.App.—San Antonio 1973, writ ref'd n.r.e.).

■ In light of Halford's testimony that some of the general contractor's repairs would actually enhance the market value and in light of the phrase contained in special issue number eight reading "despite the completion of all reasonable repair procedures," we conclude that certain matters need now be addressed. We reach this conclusion because Hunt–Stephens' theory of the case reduces the thrust of the phrase contained in special issue number eight reading, "despite the completion of all reasonable repair procedures." Thus, we conclude that the phrase "despite the completion of all reasonable repair procedures" does not apply to negate the important consequences of Halford's testimony that some of the repairs which the general contractor was performing actually would enhance the value of the shopping center and office complex. That the phrase does not apply becomes evident once the reader understands Hunt–Stephens' position as to diminution of value in relation to repair procedures. Therefore, we note Hunt–Stephens' position as to diminution of value in relation to repair procedures. We quote the first two paragraphs of Hunt–Stephens' brief under its fact statement to its first point of error:

In understanding this point of error, a brief overview of HUNT–STEPHENS' theory of damages will be helpful. As a result of the settlement with all other Defendants, many of the specific items for which specific remedial damages would have been sought were eliminated from the case. The case thus proceeded to trial on the question of whether or not [Ellisor & Tanner's] negligent design of the parking deck caused certain identifiable damages. Since the jury found no negligence in design, those items of damage are obviously irrelevant now. The case also proceeded to trial, however, on the theory that the pervasive misplacement of steel had caused *a permanent diminution in value which would exist even after all remedial steps were taken.* That permanent diminution in value is at the heart of this point of error.

(emphasis added). Thus, we read Hunt–Stephens' brief to contend that in spite of

the repairs a permanent diminution in value will remain due to original defects in construction. Hence, we conclude that when the trial court used the phrase "despite the completion of all reasonable repair procedures" in special issue number eight, the trial court was submitting the case in accordance with Hunt–Stephens' theory of the case. We conclude further that the jury understood Hunt–Stephens' theory of the case and the trial court's submission of Hunt–Stephens' theory in special issue number eight. Therefore, we understand why Hunt–Stephens does not argue that the jury failed to follow the trial court's instruction in special issue number eight in arriving at the amount of $41,500.00. Hence, we decide that the phrase "despite the completion of all reasonable repair procedures" contained in special issue number eight does not negate the important consequences of Halford's testimony establishing a zero diminution in value. Consequently, we conclude that the jury had before it a range of diminution in value between zero and $3,000,000.00 and in the proper exercise of its function as fact-finder determined $41,500.00 to be, in the words of Hunt–Stephens' brief, the "permanent diminution in value which would exist even after all remedial steps were taken." In reaching this conclusion we reason that the jury could reject in part Halford's testimony resulting in a zero diminution in value from the repair procedures and decide that the repair procedures left a "permanent diminution in value which would exist even after all remedial steps were taken" in the amount of $41,500.00 instead of the zero figure argued by Ellisor & Tanner. Therefore, we cannot say that because the jury refused to find a $2,500,000.00 to $3,000,000.00 "permanent diminution in value which would exist even after all remedial steps were taken," the jury's finding was against the great weight and preponderance of the evidence.

Considering and weighing all the evidence, we are unable to "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). In the present case, therefore, we cannot hold that the jury's findings are factually insufficient. Moreover, we cannot hold that the jury's findings are so against the great weight and preponderance of the evidence as to be manifestly unjust, or that the jury's findings shock the conscience of this court or that the jury's findings clearly demonstrate bias. *See Pool,* 715 S.W.2d at 635. Indeed, we conclude that to so hold in the present case would abuse our authority under article V, section six of the Constitution of the State of Texas and deprive Ellisor & Tanner of its right of trial by jury afforded it by article I, section fifteen of the Texas Constitution. In short, we cannot agree to "unfind" the jury's findings and substitute our judgment for that of the jury. We conclude, therefore, that the jury's finding in answer to special issue number eight is not so against the great weight and preponderance of the evidence as to be manifestly unjust. We overrule Hunt–Stephens' first and second points of error.

### Disposition

Having sustained Hunt–Stephens' third point of error, the comparison issue fails. Thus, we reverse the trial court's judgment. When we reverse the trial court's judgment, this court proceeds to render such judgment as the trial court should have rendered. *See* TEX.R.APP.P. 81(c). Having overruled Hunt–Stephens' first and second points of error, the $41,500.00 jury damage award stands. Hence, we must render such judgment as the trial court should have rendered. Hunt–Stephens' brief makes this alternative prayer for relief: "Alternatively, and only in the event the court finds the damage award was adequate but the comparative causation submission was error, Hunt–Stephens requests the court render judgment for $41,500." We have found the judgment award adequate and the comparative causation submission error. Therefore, we grant Hunt–

Stephens' alternate prayer for relief in this court and render judgment in favor of Hunt–Stephens and against Ellisor & Tanner in the sum of $41,500.00 together with interest thereon at the rate of ten (10%) percent per annum from the 10th day of July, 1986, the date of the trial court's judgment.[1] We tax all costs in this court and in the trial court against Ellisor & Tanner.

---

1. Computation of judgment rate by the consumer credit commissioner for month of July, 1986, 11 Tex.Reg. 3082 (1986), pursuant to TEX.REV. CIV.STAT.ANN. art. 5069–1.05, § 2 (Vernon Supp.1987). The contents of the Texas Register are to be judicially noticed and constitute prima facie evidence of the text of the documents published in the Register and of the fact that they are in effect on and after the date of the notation. TEX.REV.CIV.STAT.ANN. art. 6252–13a, § 4(c) (Vernon Supp.1987).