TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN





ON RECONSIDERATION EN BANC







NO. 03-09-00518-CV






Black + Vernooy Architects, J. Sinclair Black, and D. Andrew Vernooy, Appellants


v.


Lou Ann Smith; Jimmy Jackson Smith, individually and as next friend of Rachel and
Grayson Smith; and Karen E. Gravely, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT

NO. D-1-GN-06-002615, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING





D I S S E N T I N G O P I N I O N


 Robert and Kathy Maxfield, a California-based couple, hired Black + Vernooy
Architects ("BVA") to design a vacation home outside of Burnet, Texas. In addition to an $84,000
fee for design services, the Maxfields paid BVA a $16,800 fee to provide "contract administration
services" during the construction of the residence. The agreement to provide contract administration
services stated that BVA would, among other things, "endeavor to guard the Owner against defects
and deficiencies in the Work." In the course of the contract administration process, BVA architects
took multiple photographs depicting what they acknowledged at trial to be open and obvious
structural defects in a prominent feature of the Maxfields' home--the second-floor balcony
overlooking Inks Lake. BVA reviewed these photographs, but failed to identify the structural defects
or bring them to the Maxfields' attention. Shortly after construction was complete, the balcony
collapsed while the plaintiffs--third party visitors to the home--were standing on it, causing
significant personal injuries and leaving plaintiff Lou Ann Smith a paraplegic. The majority
concludes that BVA owed no duty to the plaintiffs as a matter of law and reverses the jury verdict
attributing 10% of the responsibility for the plaintiffs' injuries to BVA. Because the majority's
holding allows Texas architects performing contract administration services to turn a blind eye to
open and obvious structural defects and escape liability when foreseeable third parties are injured
as a result, I respectfully dissent.


Factual Background

 BVA senior architect Sinclair Black testified that in providing contract administration
services to the Maxfields, BVA was required to make periodic visits to the site to observe the
construction and determine whether it was in compliance with the construction documents. During
these visits, intern architect J.C. Schmeil took photographs of the balcony, which Black later
reviewed to determine if the balcony was built "[i]n compliance with the design intent." Looking
at these photographs during his testimony, Black testified that they depicted that the handrail was
not connected to the wall as required, the metal support pipes were not attached with welded and
bolted tabs as required, (1) joist hangers had not been used as required, (2) and the balcony was not bolted
to the house in the manner required by the design drawings. Black further testified that the absence
of the required rim joists and welded tabs was obvious from the photographs. Black also testified
that one of Schmeil's photographs, taken from the interior of the house, depicted plywood where the
rim joist and blocking should have been. Black acknowledged that at the stage of the framing
process depicted in the photograph, the rim joist should have been in place and visible, and that the
rim joist was critical to the structural integrity of the balcony. When asked whether the absence of
the rim joist was open and obvious at the time BVA reviewed the photographs, Black answered, "It's
obvious now. We didn't notice." Black stated that if he had noticed the defects visible in the
photographs, he "absolutely" would have requested that the contractor correct them. 

 Expert witnesses for both sides testified that the absence of the rim joist was obvious
in the photographs taken by Schmeil. The plaintiffs' expert, John Allen Pierce, also testified that
a reasonable and prudent architect would have identified the balcony defects at the time the
photographs were taken, brought the defects to the attention of the general contractor, and required
that they be corrected. Pierce further testified that the defects "should have been observed" because
the required elements were "clearly missing." In reviewing the photographs taken by Schmeil,
Pierce stated that the defects were "open and obvious" and "not hidden at all." Like Black, Pierce
testified that the presence of the rim joist was critical to the structural integrity of the balcony. Pierce
further explained that the observation of structural defects in a balcony would be critical in
endeavoring to guard an owner against defects in the work.

 BVA's expert witness, John Nyfeler, testified that in providing contract
administration services, an architect is "expected to make periodic visits to the project site to observe
the work of the contractor," "to endeavor to protect the owner against the deviations and defects in
the work," and "to call to the owner's attention deviations that he observes in . . . the quality of the
work." While Nyfeler testified it would be possible for an ordinarily prudent architect providing
contract administration services to overlook the absence of a rim joist, he also stated that the lack
of a rim joist was obvious in the photographs taken by Schmeil, and acknowledged that a reasonable
and prudent architect should pay special attention to a balcony's structural integrity during the
contract administration process. 

 The contract itself required BVA to visit the site periodically (1) to become generally
familiar with and to keep the Maxfields informed about the progress and quality of the work, (2) "to
endeavor to guard the [Maxfields] against defects and deficiencies in the [w]ork," and (3) to
determine in general if the work was being performed in a manner indicating that when fully
completed, it would be in accordance with the contract documents. The contract further provided
that BVA was not required to make "exhaustive or continuous on-site inspections" and would not
be responsible for the acts or omissions of the contractor or subcontractors. BVA retained the
authority to reject work that did not conform to the design drawings.

 After hearing the evidence regarding the structural defects in the balcony and its
subsequent collapse, the jury found that the plaintiffs' injuries were proximately caused by the
negligence of BVA, the general contractor, and the framing subcontractor who constructed the
balcony. The jury attributed only 10% of the responsibility to BVA, attributing 70% to the general
contractor and 20% to the framing subcontractor. 

 Without reaching the issue of whether BVA breached a duty to the Maxfields, the
majority concludes that any duty BVA owed to the Maxfields did not extend to foreseeable third-party visitors to the Maxfields' home. I would hold that after contracting to "endeavor to guard"
against defects and deficiencies in the work, BVA owed the Maxfields a duty to identify open and
obvious defects such as those at issue here. I would further hold that this duty extends to third
parties whose injuries were proximately caused by BVA's breach of its duty to endeavor to guard
against defects and deficiencies in the work.


Existence of a Duty


 A contract for professional services gives rise to a duty by the professional to exercise
the degree of care, skill, and competence that reasonably competent members of the profession
would exercise under similar circumstances. Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C.,
252 S.W.3d 586, 594 (Tex. App.--Fort Worth 2008, pet. denied). An architect's duty "depends on
the particular agreement entered into with his employer." Id. 

 Here, the contract for design and contract administration services that BVA entered
into with the Maxfields provided that BVA would:


visit the site at intervals appropriate to the state of the Contractor's operations, or as
otherwise agreed by the Owner and the Architect in Article 12, (1) to become
generally familiar with and to keep the Owner informed about the progress and
quality of the portion of the Work completed, (2) to endeavor to guard the Owner
against defects and deficiencies in the Work, and (3) to determine in general if the
Work is being performed in a manner indicating that the Work, when fully
completed, will be in accordance with the Contract Documents. 


(Emphasis added.) The contract further provided: 


the Architect shall not be responsible for the Contractor's failure to perform the
Work in accordance with the requirements of the Contract Documents. The
Architect shall be responsible for the Architect's negligent acts or omissions, but
shall not have control over or charge of and shall not be responsible for acts or
omissions of the Contractor, Subcontractors, or their agents or employees, or of any
other persons or entities performing portions of the Work.


 In Hunt v. Ellisor & Tanner, Inc., 739 S.W.2d 933, 935 (Tex. App.--Dallas 1987,
writ denied), a case in which a general contractor had failed to build a parking garage in accordance
with the plans and specifications, the court of appeals addressed the architect's liability under
virtually identical "endeavor to guard" contract language. The contract at issue in Hunt stated:


The Architect will make periodic visits to the site to familiarize himself generally
with the progress and quality of the Work and to determine in general if the Work is
proceeding in accordance with the Contract Documents. On the basis of his on-site
observations as an architect, he will keep the Owner informed of the progress of the
Work, and will endeavor to guard the Owner against defects and deficiencies in the
Work of the Contractor. The Architect will not be required to make exhaustive
on-site inspections to check the quality and quantity of the Work. The Architect will
not be responsible for the construction means, methods, techniques, sequences or
procedures, or for the safety precautions and programs in connection with the Work,
and he will not be responsible for the contractor's failure to carry out the Work in
accordance with the Contract Documents.


Id. (emphasis added). The architect in Hunt made essentially the same argument made by BVA in
the present case--that due to the contract language stating that the architect is not responsible for
the contractor's failure to carry out the work in accordance with the contract documents, the
architect's agreement to "endeavor to guard" the owner against defects and deficiencies did not
expose the architect to liability for failure to identify any such defects or deficiencies. See id. at 936-37. The court of appeals rejected that argument, stating:


We conclude that the language said to be exculpatory constitutes nothing other than
an agreement that the architect is not the insurer or guarantor of the general
contractor's obligation to carry out the work in accordance with the contract
documents. We reach this conclusion because the first three sentences of [the
contract provision quoted above] impose a nonconstruction responsibility upon the
architect; to wit: to visit, to familiarize, to determine, to inform and to endeavor to
guard. In short, to provide information, not to make improvements upon the job site. 
Therefore, we reason that the fourth sentence of [the contract provision] . . . exist[s]
to emphasize the architect's nonconstruction responsibility and to make certain that
the architect "will not be responsible for the [general] contractor's failure to carry out
the work in accordance with the contract documents." In short, the provider of
information to the owner does not insure or guarantee the general contractor's work. 
It follows, and we so hold, that the contract does not exculpate [the architect] from
liability for the general contractor's failure to carry out the work in accordance with
the contract documents.


Id. at 937 (emphasis added). Because I agree with the reasoning of Hunt, I would hold that while
BVA is not a guarantor or insurer of the general contractor's work, it did take on "a nonconstruction
responsibility" to "visit, to familiarize, to determine, to inform[,] and to endeavor to guard" the
Maxfields from defects and deficiencies in the work. Thus, BVA may be held liable, not for the
general contractor's negligence, but for a breach of its own duty as a "provider of information." Id.;
see also Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd., 506 N.W.2d 706, 710-11
(Neb. 1993) (reviewing similar "endeavor to guard" provision and holding that language stating
architect is not responsible for acts or omissions of contractor "does not absolve the architect from
liability for a breach of the architect's contractual duty, if one exists, to inform the owner of
deviations from the building plans when the architect has agreed to make periodic observations"). 
This is consistent with the contract provision stating, "The Architect shall be responsible for the
Architect's negligent acts or omissions, but shall not . . . be responsible for acts or omissions of the
Contractor . . . ."

 As the court in Hunt clarified, "[W]e observe the separate and independent contract
obligations to [the owner] of both the general contractor and [the architect]. Each breached its
obligations. [The architect] breached its obligation to observe the progress of the work and to
endeavor to guard [the owner] against defects in the work." 739 S.W.2d at 939. Here, too, BVA had
a nonconstruction obligation to endeavor to guard the Maxfields against defects in the work, and the
jury was entitled to determine whether BVA was negligent in the performance of that duty. 

 The fact that the defects in question did not come to BVA's attention during the
contract administration process does not alter my analysis, as BVA's admitted failure to observe
visible and obvious defects affecting critical safety and structural integrity aspects of the balcony,
despite taking and reviewing photographs of those defects, represents more than a scintilla of
evidence that BVA did not fulfill its duty to "endeavor to guard" the Maxfields against defects and
deficiencies. While BVA's expert witness testified that a reasonable and prudent architect could
have overlooked the defects in the photographs, the plaintiffs' expert testified that for a reasonable
and prudent architect hired to perform contract administration services, the defects "should have
been observed" because the required elements were "clearly missing." The jury, as finder of fact,
was responsible for evaluating the credibility of witnesses and the weight to be given their testimony. 
See Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). 


Duty to Third-Party Visitors

 Having reached the conclusion that BVA did in fact owe the Maxfields a duty to
endeavor to guard against defects and deficiencies in the work, I now turn to the issue of whether
this duty extended to third-party visitors to the Maxfields' home.

 

 Contractual Privity


 The majority begins its analysis by emphasizing that the plaintiffs cannot recover as
third-party beneficiaries to BVA's contract with the Maxfields. While I agree that the plaintiffs are
not third-party beneficiaries to the contract, privity of contract is not required in a negligence claim
resulting in personal injury. See Ely v. General Motors Corp., 927 S.W.2d 774, 781 (Tex.
App.--Texarkana 1996, writ denied) ("Although a third party could not recover under the terms of
the contract unless he or she proved his or her status as third-party beneficiary, a tort duty may arise
from a contractual relationship. Privity is generally not a defense to a negligence suit for personal
injuries."); Johnson v. Continental Constructors, Inc., 630 S.W.2d 365, 370 (Tex. App.--Austin
1982, writ ref'd n.r.e.) ("The defense of 'privity' is not permitted in suits for personal injury, whether
founded upon a claim of negligence or upon a claim of strict liability . . . ."); see also Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co., 517 A.2d 336, 343-44 (Md. 1986)
(holding that duty of architect to use due care in fulfilling its contractual duties "extended to those
persons foreseeably subjected to the risk of personal injury," given that "privity is not an absolute
prerequisite to the existence of a tort duty"). The majority cites Stine v. Stewart for the proposition
that a third party may recover on a contract only if "the parties intended to secure a benefit to the
third party, and only if the contracting parties entered into the contract directly for the third party's
benefit." 80 S.W.3d 586, 589 (Tex. 2002). Unlike the third party at issue in Stine, the plaintiffs in
this case are not attempting to bring a breach-of-contract claim against BVA to recover for an
economic loss, but a negligence claim to recover damages for personal injuries. 

 In Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C., the court recognized that
the terms of an architect's contract for professional services could give rise to tort liability for
injuries sustained by a non-contracting party. 252 S.W.3d at 594. In a wrongful-death claim
resulting from the drowning of four individuals in an outdoor water sculpture owned by the City of
Fort Worth, the court stated that it would look to the defendant architects' "April 22, 1999
contractual agreement [with the City] to determine whether [the architects] owed a duty to the
decedents. The scope of [the architects'] duty is determined by this contract." Id. at 594-95. 
Reviewing the language of the contract, the court determined that in contracting with the City to
review "existing conditions" in the outdoor water park, the architects did not agree to address safety
issues, and therefore did not owe a duty--either to the City or to the third-party decedents--to report
or make safe any hazards they might have detected. Id. at 595. In stating that the scope of the
architects' duty to the decedents was determined by their contract with the City, the court
acknowledged that negligence in the performance of an architect's contractual duties can result in
liability when a non-contracting third party is injured. 

 While the majority emphasizes that the contract between BVA and the Maxfields
provides that the agreement does not create a cause of action in favor of a third party, a similar
contract provision was rejected as a limitation on negligence liability in Ely v. General Motors Corp.,
927 S.W.2d at 781. The plaintiff in Ely asserted that General Motors had breached a contractual duty
to a franchisee and that this breach had proximately caused the plaintiff personal injuries. Id. In
response, General Motors argued that the breach could not give rise to tort liability to the plaintiff
because the contract between General Motors and its franchisee expressly disclaimed any duty to
third parties. Id. The court disagreed, stating, "Neither [the franchisee] nor General
Motors . . . could effectively waive the negligence claims of third parties. Therefore, the disclaimer
in the contract will not disclaim Ely's negligence claim." Id. (3) Similarly, neither BVA nor the
Maxfields have the power to waive future negligence claims on behalf of third parties. 

 While parties are typically free to exempt one another from future liability, a party
cannot "by contract with a third party, lay down his own rules as to when he will be liable to those
whom his negligence injures." McCarthy v. J.P. Cullen & Son Corp., 199 N.W.2d 362, 370 (Iowa
1972). While a contracting party is typically in a situation to protect itself from economic loss and
contract for the degree of risk that it is willing to accept, third-party visitors to a vacation home
should not be required to bargain for the expectation of a structurally sound second-floor balcony. 
Thus, the disclaimer of third-party claims in the contract between BVA and the Maxfields does not
preclude us from determining whether BVA had a duty to perform its contractual obligations in a
manner that would not cause injury to foreseeable third parties. See Dukes, 252 S.W.3d at 594 ("A
contract for professional services gives rise to a duty by the professional to exercise the degree of
care, skill, and competence that reasonably competent members of the profession would exercise
under similar circumstances.").

 Existence of a Common-Law Duty

 Given that the plaintiffs' lack of contractual privity does not preclude them from
recovering for their injuries, the relevant question is whether the circumstances surrounding BVA's
contract with the Maxfields gave rise to a common-law duty to the plaintiffs. Whether a legal duty
exists is a question of law for the court to decide from the facts surrounding the occurrence in
question. Id. at 591. Determining whether a legal duty exists requires the balancing of "factors such
as the risk and foreseeability of injury, the social utility of the actor's conduct, the consequences of
imposing the burden on the actor, and any other relevant competing individual and social interests
implicated by the facts of the case." Texas Home Mgmt., Inc. v. Peavy, 89 S.W.3d 30, 33 (Tex.
2002). Other factors to consider include whether one party has superior knowledge of the risk, the
right to control the actor whose conduct precipitated the harm, and the magnitude of the burden of
guarding against the injury. See Graff v. Beard, 858 S.W.2d 918, 920 (Tex. 1993). 

 As the majority opinion points out, BVA's conduct in this case created a foreseeable
risk of injury to third-party visitors. When an architect agrees to provide contract administration
services, that architect's failure to notify the owner of observable and dangerous deviations from the
architect's own design drawings, particularly in connection with an element like a balcony where
construction in accordance with the design drawings is a critical safety issue, creates a foreseeable
risk of injury for visitors lawfully on the premises. BVA architects viewed photographs depicting
nails where the required bolts should have been, thin metal clips where welded tabs should have
been, the absence of the joist hangers required by the design drawings and the uniform building code,
and the absence of a rim joist and blocking, which Black acknowledged was critical to the structural
integrity of the balcony. Given the number and nature of these defects, the risk of injury to a third-party visitor from BVA's failure to identify the defects and bring them to the owner's attention was
foreseeable. The owners of a residence are not typically the only individuals to ever set foot on the
premises, or to walk out onto the balcony. Furthermore, there was evidence in the present case that
Kathy Maxfield had indicated to BVA during the construction process that she intended to frequently
host visitors at the home. (4) Photographs entered into evidence at trial also reflect that the balcony
provided a view of Inks Lake, which increases the likelihood that visitors to the Maxfields' vacation
home would be drawn to step out onto the balcony. (5) Under these circumstances, there was a
foreseeable risk that a third-party visitor to the home would be injured as a result of BVA's failure
to fulfill its "nonconstruction responsibility" to "visit, to familiarize, to determine, to inform[,] and
to endeavor to guard." See Hunt, 739 S.W.2d at 937. In determining whether a legal duty exists,
"foreseeability of the risk is the foremost and dominant consideration." Greater Houston Transp.
Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990) (internal quotations omitted).

 The foreseeability factor is particularly important in this case, given the public's
reliance on design professionals to properly perform their contractual obligations as a matter of
public safety. When a visitor to a residence, lawfully on the premises, walks out onto a balcony, the
personal safety of that visitor depends on certain professionals having non-negligently performed
their contractual duties with respect to the balcony. In a case where an architect was hired to perform
contract administration and to "endeavor to guard" the owner against defects and deficiencies in the
work, the visitor's safety depends on the architect having fulfilled this duty using the level of care,
skill, and diligence that would be exercised by a reasonably prudent architect under similar
circumstances.

 While the majority acknowledges that the foreseeability and likelihood-of-injury
factors "arguably" weigh in favor of a finding that BVA owed the plaintiffs a duty of care, it
determines that the remaining factors compel the opposite conclusion--that BVA's duty to
endeavor to guard against defects and deficiencies did not extend to third-party visitors to the
home. The majority places particular emphasis on the right to control the actor whose conduct
precipitated the harm, pointing out that the contract did not give BVA the right to control the
means or methods of construction. I agree that BVA had no duty related to the right to control the
means or methods of construction. The duty that BVA owed to the Maxfields and, by extension,
to foreseeable third-party visitors to the home, was a "nonconstruction responsibility" to "visit, to
familiarize, to determine, to inform[,] and to endeavor to guard" against defects and deficiencies
in the work. Hunt, 739 S.W.2d at 937. 

 The relevant consideration with respect to the issue of control is whether BVA had
a "right to control the actor whose conduct precipitated the harm." Graff, 858 S.W.2d at 920. 
BVA should not be held liable for the actions of the contractor or the subcontractor, but it should
be held liable for its own negligent performance of its own contractual duties. There is no question
that BVA had control over its own architects and whether or not those architects fulfilled their
"nonconstruction responsibility" to endeavor to guard against defects and deficiencies in the work. 
Under the circumstances presented here, a reasonable jury could have determined--and in fact, did
determine--that by turning a blind eye to open and obvious structural defects and limiting their
review of the balcony to whether it was "under the proper door opening," BVA architects
precipitated the harm caused to the plaintiffs. (6) 

 In addressing the right of control, the majority relies on Romero v. Parkhill, Smith
& Cooper, Inc., in which the court held that an engineer had no duty to ensure the safety of a
subcontractor's employee on a construction site because the engineer did not have the right to
control the means and methods of construction. 881 S.W.2d 522, 526-27 (Tex. App.--El Paso
1994, writ denied). The plaintiffs alleged that the engineer was "negligent in its supervision,
control, and inspection of the construction site" and that this negligence proximately caused the
employee's injuries when he fell through a hole in the roof of a building during construction. Id.
at 524. In the present case, however, the plaintiffs do not allege that BVA caused their injuries
by a failure to control the construction site. Rather, they complain that their injuries were
caused by BVA's negligence in fulfilling its obligation as a "provider of information." Hunt,
739 S.W.2d at 937.

 I agree that BVA's liability is limited by the fact that it did not have a right to
control the means and methods of construction. BVA did not have a duty to ensure that the
construction site was a safe place to work, verify that the contractor was following federal safety
regulations, or perform any other duty dependent on exercise of control over the construction site. 
See Romero, 881 S.W.2d at 526-27; see also Coastal Marine Serv. of Tex., Inc. v. Lawrence,
988 S.W.2d 223, 226 (Tex. 1999) (holding that premises owner was not liable for injuries
sustained on construction site by independent contractor because owner had no right to control
independent contractor's work); Graham v. Freese & Nichols, Inc., 927 S.W.2d 294, 296 (Tex.
App.--Eastland 1996, writ denied) (holding that engineer did not owe duty to injured employee
of general contractor because engineer had no control over "the construction procedures and the
safety precautions at the work site"). Despite its lack of control over the means and methods of
construction, however, BVA still had a nonconstruction obligation to endeavor to guard against
defects and deficiencies in the work. When an architect fails to carry out its duties under a contract
with "the degree of care, skill, and competence that reasonably competent members of the
profession would exercise under similar circumstances," it should be held liable to third parties
that are injured by its negligence. Dukes, 252 S.W.3d at 594. 

 Another factor that the majority relies upon in determining that no duty exists is the
social utility of the actor's conduct. While I agree that there is some social utility in allowing an
architect to perform contract administration services, this utility quickly fades when an architect
gives false assurances that it will endeavor to guard against defects and deficiencies in the work
and then utterly fails to do so. BVA contractually agreed to periodically visit the construction site
in order to become familiar with the work, keep the Maxfields informed about the progress and
quality of the work, endeavor to guard against defects and deficiencies, and determine in general
if the work was being performed in a manner indicating that when fully completed, it would be in
accordance with contract documents. I fail to see the social utility in allowing an architect
performing these services to "close his eyes on the construction site, refrain from engaging in any
inspection procedure whatsoever, and then disclaim liability for construction defects that even the
most perfunctory monitoring would have prevented." First Nat'l Bank of Akron v. Cann, 503 F.
Supp. 419, 436 (N.D. Ohio 1980), aff'd, 669 F.2d 415 (6th Cir. 1982). (7)

 Another relevant factor in determining the existence of the duty is whether one party
has superior knowledge of the risk. Graff, 858 S.W.2d at 920. The majority contends that BVA's
knowledge of the design plans would not be superior to that of the general contractor, as the party
with the right to control the manner and means of construction, or of the subcontractor, as the party
who physically constructed the balcony. While both the contractor and subcontractor had the
opportunity and the obligation to review and follow BVA's design plans, there is a reason the
Maxfields paid BVA $84,000 to create those plans. The relative importance of each element of
the design plans, the potential for acceptable alternatives, and the consequences of any deviations
from the plans would be within the particular knowledge of the licensed professional architect who
prepared them. BVA's position of superior knowledge is exemplified by the fact that neither the
contractor nor the subcontractor was authorized to deviate from the design plans without first
obtaining the approval of BVA. The balcony design drawings, which were entered into evidence,
included the following notation: "Installation or completion of building elements in direct conflict
with intent of drawings (as expressed in architectural documents) will not be acceptable without
written approval from architect." Every entity on the construction site looked to BVA as the
ultimate authority on the design plans. As the party with final approval and authority over the
design of the home, BVA had superior knowledge of the risk related to any deviations from its own
drawings.

 Furthermore, it is beyond dispute that between BVA and any third-party visitor to
the home who might choose to walk out on the balcony, the party with superior knowledge of the
risk would be the team of architects with years of professional training who actually designed the
home and conducted periodic site visits during the construction phase in order to endeavor to guard
against defects and deficiencies in the work. (8) Thus, I would view the factor related to the superior
knowledge of the risk as weighing in favor of extending BVA's duty to third-party visitors.

 The majority concludes that the magnitude of the burden is significant and should
be given substantial weight in determining whether the duty to endeavor to guard against defects
and deficiencies extends to the plaintiffs in this case. In reaching this conclusion, the majority
expresses concern that architects will be forced to conduct exhaustive inspections in order to
identify every possible defect in a construction project. If the duty at issue here required BVA to
identify every construction defect in the Maxfields' home, I would be inclined to agree. But given
the undisputed testimony that the defects were not merely visible, but open and obvious in the
photographs taken by Schmeil in the course of providing contract administration services, no
inspections--exhaustive or otherwise--were necessary. BVA could have discovered the defects
by simply looking at the photographs. 

 The majority points out that a particular defect might not be visible during any of
an architects' periodic site visits, and that the absence of a particular piece of construction during
a particular visit would not necessarily indicate that the piece would not be added later. The
existence of a legal duty must be determined based on the facts surrounding the occurrence in
question. Dukes, 252 S.W.3d at 591. The evidence in this case is unique in that the defects can
be identified on photographs actually taken by the architects in the course of providing contract
administration services. In a situation where a defect is created and then immediately obscured
by walls or ceilings so that it is never observable to the architect during a site visit, no duty to
identify the defect would arise. Similarly, it is possible that no duty would arise if a defect is only
visible from a certain vantage point and there is no evidence that the architect ever viewed the
defect from that particular vantage point. But those are not the facts of this case. In this case,
Schmeil himself took photographs depicting the defects and deviations from the design drawings. 
There is no question that the defects were not only observable to Schmeil during his site visit, but
also observable to both Schmeil and Black during their subsequent review of the photographs. 

 As to the possibility of missing elements being added at a later date, Black testified 
that at the stage of completion depicted in the photographs he reviewed, the rim joist and blocking
should have been in place and visible. When questioned as to whether the contractor could have
gone back after the photographs were taken and remedied some of the defects by adding joist
hangers or reattaching the support pipes using welded tabs, Pierce, the plaintiffs' expert, testified
that "it would be something that I would certainly want to ask about because it looks like it's a
permanent installation, and it's not in conformance with the [design] documents." Similarly, while
BVA's counsel suggested during cross-examination that the subcontractor could have used an
alternative method of installing joist hangers that would render them invisible, Pierce testified,
"[I]f the joist hanger was invisible and was not apparently there, if I were the architect I would
certainly inquire as to where the joist hanger is, how it's installed, what did you replace it with[.]"

 Extension of the duty at issue here would not require an architect to inspect the
construction site for defects, discover hidden defects, or ascertain all deviations from the design
drawings, regardless of their significance or safety implications. (9) BVA simply had a duty, after
contractually agreeing to visit the site periodically to "endeavor to guard" against defects and
deficiencies in the work, to identify significant deviations from its own design drawings when
those deviations implicated critical structural integrity concerns and were plainly visible on
photographs taken and reviewed by its architects in the course of performing contract
administration services. This duty should be extended to the plaintiffs in the very limited
circumstances present here, where the defects were open, obvious, observable to the architect,
implicated critical safety and structural integrity concerns, involved significant deviations from the
architect's own design drawings despite the fact that preapproval of any such deviation was
required, and were overlooked by an architect who contracted to provide contract
administration services.

 It is also worth noting that the magnitude of the burden at issue here is further
limited by the statute of repose. See Tex. Civ. Prac. & Rem. Code Ann. § 16.008 (West 2002). 
Under this statute, a suit against any registered or licensed architect "who designs, plans, or
inspects the construction of an improvement to real property or equipment attached to real
property" may not be filed "later than 10 years after the substantial completion of the improvement
or the beginning of operation of the equipment in an action arising out of a defective or unsafe
condition of the real property, the improvement, or the equipment." Id.

 Finally, the consequences of extending this duty to third parties are not so
burdensome to the architect as to outweigh the remaining factors in favor of doing so. I disagree
with the majority's contention that extension of this duty to foreseeable third parties will require
an architect providing contract administration services to act as a guarantor or insurer of the work
of the general contractor. On the contrary, the architect is required only to act in a reasonable and
prudent manner, just as anyone else must do in order to avoid negligence liability. It cannot be a
particularly onerous burden to expect an architect providing contract administration services to
refrain from "clos[ing] his eyes on the construction site" and then "disclaim[ing] liability for
construction defects that even the most perfunctory monitoring would have prevented." Cann,
503 F. Supp. at 436.

 In its motion for en banc review, BVA takes the position that the consequences of
extending this duty to third parties are unduly burdensome because architects will be forced to
increase their fees for contract administration services and in turn, "[m]any owners of small-scale
projects will choose to dispense with the architect's contract administration services." According
to BVA, "[t]his result will not be in the public interest." It is unclear how this result would
negatively affect the public interest, given that under BVA's position and the majority's holding,
the provision of contract administration services means an architect can charge the client thousands
of dollars and do virtually nothing in return. BVA contends that the public interest would be
harmed if fewer projects retain architects for contract administration services because intern
architects might have difficulty acquiring the requisite number of hours of contract administration
experience to become licensed architects. How many Texas balconies must crash to the ground
before we dare impede the ability of an intern architect to meet his or her training requirements? 
Such a result would hardly appear to be in the public interest.

 If Kathy Maxfield were standing on the balcony with the plaintiffs when it
collapsed, the majority's holding would allow Kathy to recover for her injuries, while her guests
could not. I see no compelling reason to limit BVA's liability in this manner. Given the
foreseeability and likelihood of harm, BVA's superior knowledge of the risk, BVA's right to
control its own architects in fulfilling contract administration responsibilities, the limited social
utility of BVA's conduct in the absence of any duty to third parties, and the limited magnitude and
consequences of the burden imposed by the duty, I would hold that BVA's duty to endeavor to
guard the Maxfields against defects and deficiencies in the work extended to foreseeable third
parties when such defects were open, obvious, and implicated critical safety and structural integrity
concerns. Because the majority opinion holds otherwise, I respectfully dissent.



_____________________________________________

 Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear, Pemberton, Henson, Rose and Goodwin;

 Joined by Chief Justice Jones


Filed: August 5, 2011
1. The plaintiffs' expert witness, John Allen Pierce, testified that the metal support pipes were
attached to the balcony using a type of thin metal clip that would generally be used to support "light-weight items such as electric conduit or plumbing piping." 
2. Black testified that the use of joist hangers was not only required by the design drawings,
but also by the 1997 Uniform Building Code, published by the International Council of Building
Officials. The "purpose" provision of the code, which was entered into evidence, states that the
code's purpose "is to provide minimum standards to safeguard life or limb, health, property and
public welfare."
3. The court went on to determine that General Motors' breach of its contractual duty did not
proximately cause Ely's injuries. Ely v. General Motors Corp., 927 S.W.2d 774, 782 (Tex.
App.--Texarkana 1996, writ denied). 
4. The record contains an email from Kathy Maxfield to Schmeil stating that a certain type
of door would "seem less bother for a family place," as well as an email from Schmeil to Kathy
Maxfield recommending rounded drywall corners because "the fact that this will be a vacation home
used by lots of family may have some bearing on the decision (rounded might be able to take a little
more abuse)." The record also contains a memorandum from Schmeil to Nash stating, "[S]ince it
is a vacation house that will get pretty heavy use from extended family, [Kathy Maxfield] decided
to go with the rounded corners."
5. Gravely in fact testified that she had asked Smith to accompany her out onto the balcony
for the purpose of enjoying the view.
6. At trial, Schmeil acknowledged that in his deposition testimony, he maintained that he had
not looked for structural defects in the balcony because he believed his responsibility was limited
to making "sure that it was the correct size and under the proper door opening."
7. The court in Cann was faced with a contract similar to the one at issue here, providing that
the architect was not required to make continuous on-site inspections to check the quality and
quantity of the work and was not responsible for the contractor's failure to complete the work in
accordance with the plans. First Nat'l Bank of Akron v. Cann, 503 F. Supp. 419, 436 (N.D. Ohio
1980), aff'd, 669 F.2d 415 (6th Cir. 1982). Nevertheless, the court stated that even where continuous
on-site inspections were not required, the architect had a contractual obligation to, at a minimum,
identify defects discoverable under "the most general supervision." Id. While the court ultimately
determined that no tort liability had been established, this holding was based on the absence of any
expert testimony that a reasonable, prudent architect would have supervised the project in such a
manner that the defects would have been discovered. Id. at 439. In contrast, the plaintiffs in the
present case provided expert testimony that a reasonably prudent architect providing contract
administration services would have identified the structural defects visible in the photographs and
brought them to the owner's attention.
8. The majority contends that BVA, the contractor, and the subcontractor are the only relevant
parties for purposes of comparing relative knowledge of the risk. Other Texas cases applying this
balancing test to determine existence of a common-law duty have reviewed the relationship between
the plaintiff and the defendant, as opposed to the relationship between the defendant and a culpable
third party, to determine which party possessed superior knowledge of the risk. See Nichols v.
Tanglewood Manor Apartments, No. 14-04-00864-CV, 2006 Tex. App. LEXIS 975, at *8-9 (Tex.
App.--Houston [14th Dist.] Feb. 7, 2006, no pet.) (mem. op.) (determining that property owner did
not owe duty to protect plaintiff from criminal act of third party where plaintiff's knowledge of past
incidents of sexual assault on property was superior to that of property owner); Ovalle v. Mares, No.
04-04-00806-CV, 2005 Tex. App. LEXIS 10844, at *5 (Tex. App.--San Antonio Dec. 28, 2005, no
pet.) (mem. op.) (concluding that defendant did not owe minor plaintiff duty to prevent her from
getting into car with intoxicated driver where plaintiff had superior knowledge of driver's intoxicated
state).
9. The contract in this case did give BVA a right to inspect the construction.